STATE OF IOWA, Appellant, v. E. C. HINSHAW, Appellee.

**OFFICERS:** Accounting—Fees of State Fish and Game Warden. The
1    state fish and game warden, in executing his statutory power to permit non-game fish to be taken from the waters of the state, provided they are taken ''in the presence of himself or deputy and without expense to the state,'' is under no legal obligation to account to the state for charges exacted for such privilege and *paid to his deputy* as compensation for supervising such taking.

**OFFICERS:** Accounting—Voluntary Contributions. The fish and game
2    warden, in permitting non-game fish to be taken from the waters of the state, is under no legal obligation to account to the state for *voluntary* contributions paid by the fishermen to the warden and employed by him for the purpose of improving said waters, with the consent of the executive council.

**OFFICERS:** Accounting—Profits of Independent Venture. The state
3    fish and game warden may validly enter upon the business of dealing in fish lawfully taken from the waters of the state, by buying from those who voluntarily care to sell to him, and is under no legal obligation to account to the state for the profits realized from the venture.

*Appeal from Dickinson District Court.*—JAMES DELAND, Judge.

MAY 13, 1924.

SUIT in equity for an accounting. The defendant was fish and game warden of the state, and the suit is to recover funds claimed to have been received by defendant and belonging to the state. The trial court dismissed the petition, and the State appeals.—*Affirmed.*

*Ben J. Gibson,* Attorney-general, and *B. J. Powers,* Assistant Attorney-general, for appellant.

*Francis & Owen* and *J. W. Morse,* for appellee.

FAVILLE, J.—I. From April 1, 1913, until April 10, 1919, appellee held the office of fish and game warden of this state.

It is contended that he received funds from three different sources, for which he should be held to account to the state. It is contended that appellee charged and collected from fisher-

1. OFFICERS: accounting: fees of state fish and game warden.

men a fee of $10 for permits to take so-called "soft fish" from state waters, and that some $800 was received in this way and not paid over to the state. Code Supplement, 1913, Section 2546, provides in part as follows:

"* * * the warden may, upon proper application in writing, made upon blanks furnished by said warden, issue to whomsoever he may see fit, written permits, upon blank forms to be furnished by said warden, suspending for a specified period specified portions of this chapter relating to fishing and authorizing the person to whom said permit is issued, to take from certain designated lakes of the state, having an area of not less than two square miles, buffalo, carp, quillbacks, red horse, suckers and gar, as in said permit named, in any quantities and for all purposes; provided, however, that no such permit holder shall be authorized to exercise the rights granted in said permit, except in the presence and under the supervision of the warden or one or more of his regularly constituted deputies, without expense to the state, and provided that seining shall not be

permitted between the first day of December and the fifteenth day of June."

Under the provisions of this statute, it appears that appellee did issue permits to some eighty fishermen, who paid $10 each therefor. It is to be noticed that the statute provides that permit holders are authorized to exercise the rights granted under the permit only in the presence and under the supervision of the warden or one of his deputies, and this "without expense to the state." The purpose of the legislature in enacting this statute was to provide a means by which certain kinds of fish might be removed from the waters of the state. It is established by the record, and is also a matter of common knowledge, that the fish named in this statute are what are known as "soft fish," as distinguished from so-called "game fish." The former are regarded by fishermen as quite plebian and wholly lacking in the desirable characteristics of their more aristocratic brethren, the "game fish." A "soft fish" is not tempted by the most alluring bait of the angler. He must be taken, if at all, by the spear or net. He gives to no Isaac Walton the wonted thrill of singing reel or bending rod. He pursues the even tenor of his way in shallow waters and among aquatic vegetation. He is even accused of being a scavenger. The evidence in this case shows that he is a great destroyer of the spawn of game fish. He is treated with contempt by the epicurean, although he furnishes food for those of less exacting tastes. It is, therefore, regarded as desirable to eliminate the soft fish from the public waters of the state. The statute authorizing such removal by parties who have obtained permits from the state fish and game warden expressly provides that such work shall be done under the supervision of the warden or one of his deputies. This, of course, is to prevent the taking of game fish, and any improper methods in the work. But the statute expressly provides that this work of supervision shall be "without expense to the state." Therefore, a fee of $10 was charged by appellee for each permit, and the undisputed evidence shows that in every instance this fee was given to the deputy who supervised the work. Appellee did not profit by the fee charged for these permits. Upon what theory of equity or good conscience can the State claim that appellee should account to it for the fees so collected and so used?

The statute made no provision for the collection of a fee for such permits as a condition of issuing the same, but does require that the services of the deputy wardens in supervising the work shall be "without expense to the state." We see nothing in the transactions as conducted by appellee that gave the state any right whatever to an accounting for the fees so collected, nor do we see impropriety in its collection and use in the manner in which it was done. Without some such plan, the statute would have been practically inoperative; for the deputies could scarcely be expected to supervise the work without any compensation therefor, and, the work being done "without expense to the state," they could not draw a per diem therefor, under Code Supplement, 1913, Section 2562.

We see no merit in appellant's contention as to this item.

II. The State contends that appellee received from the various permit holders a large amount in addition to the $10 fee for the issuance of the permit. This amount ranged all the

2. OFFICERS: accounting: voluntary contributions. way from a quarter of a cent to two cents a pound for the fish taken by the permit holders. Appellee frankly admits that he did receive various sums of money from permit holders, and that the same were paid to him on a basis of the number of pounds of fish taken by the permit holders. The only question at this point is whether appellee should account to the state for the money so taken.

It appears from the record that, in the early part of the administration of the office of fish and game warden by appellee, it became evident that it was desirable that some of the lakes of the state be dredged and deepened, and that the shores be protected. There were no funds available for this purpose, and appellee consulted with the governor of the state, and the governor obtained from the attorney-general a written opinion with regard to the right of appellee to collect money from the fishermen holding permits to remove the soft fish from the lakes, and to expend the money so paid to him for the improvement of the lakes. The written opinion of the attorney-general stated, among other things:

"There is, however, no authority for anyone to pay the state fish and game warden a half cent a pound for all fish sold which are caught in a particular lake. As I understand this matter,

this is a voluntary contribution or donation upon the part of these men who fish, who desire to contribute that much in order that the lakes may be improved. I see nothing in the law to prevent the state fish and game warden from acting in a private capacity as treasurer for these men, and from also using the fund for the improvement of the lake, provided that the improvement of the lake meets with the approval or sanction of the executive council; and provided further that the permit issued by the fish and game warden under the provisions of Section 2546, Supplement to the Code, 1907, is not limited to those who voluntarily make contributions, and further, that such permit is not issued as a consideration for the money paid."

This opinion by the attorney-general appears to us to be a correct statement of the law in regard to said matter.

It appears that, after receiving said opinion, appellee did collect and receive from permit holders who were authorized to remove fish from the lakes of the state, various contributions of money. There is no dispute in the evidence that said contributions were made voluntarily by the permit holders. No one was ever required to make such contributions or to promise to make the same as a condition to the issuance of a permit.

The funds so collected by appellee were expended by him for the improvement of the various lakes of the state. As we understand the record, a separate account was kept of the amount so contributed by the permit holders at each of the various lakes, and the money was expended upon the lake where the respective funds were paid. There is no claim and no proof that appellee received for his own use and benefit any of this money so collected. A large amount was used in riprapping, constructing cement work, and other improvements on different lakes in the state.

The State complains that it appears from the testimony that appellee returned to two different parties a portion of the money that had been contributed. Appellee explains these transactions on the ground that these men had performed services at two different lakes where he had sent them for a specific purpose, and where they had operated at his request and under his direction at a loss, and the reimbursement was made out of the contributed funds, under such circumstances.

No person making any contribution to these funds makes any claim to any portion thereof, or any complaint of the manner in which appellee disposed of the same; and they all say they were made voluntarily.

We fail to see wherein the state acquired any right to these funds. Suppose the contribution had been made by public-spirited citizens who were not permit holders or fishermen, but who desired to have the lakes improved, and appellee had acted as agent for said parties in receiving and disbursing said funds. Could anyone successfully contend that the state had any interest in said funds, although the agent was the state fish and game warden and although the money was contributed for the purpose of improving the public waters of the state?

We see nothing in this contention by the State that would require appellee to account for any of the money so collected or expended by him.

III. The State contends that appellee engaged in the business of selling fish that were taken from the lakes of the state, and that he made a profit in said business, and that the state is entitled to an accounting for the profit so made.

3. OFFICERS: accounting: profits of independent venture.

Appellee makes no denial whatever in regard to the claim that he did engage in the business of buying and selling fish taken from the waters of the state, and that he did make a profit in connection with the said business. The sole question is as to whether or not he should account to the state for the profit so made by him.

During the World War, the conservation of food was a matter of great public concern. There existed in the state what was known as a "board of conservation." The secretary of this board wrote appellee in regard to selling fish to the people of the state. Thereafter, appellee consulted with the governor and other officials, and the matter was discussed at length. It was determined that the state was without funds or authority to engage in the business of handling the fish industry, so as to benefit the people of the state and conserve the food. It was finally determined that the matter could be handled if appellee would undertake to purchase the fish from the fishermen and resell them, conducting the business on his own responsibility

and furnishing the necessary funds therefor and running all the risk and being entitled to the profits, if any were made.

In pursuance of this arrangement, appellee did engage in this business. He bought fish from the fishermen who lawfully took the same from the waters of the state, and resold to other parties the fish so purchased. In so doing, he made a profit estimated at approximately $6,000, in conducting the entire business during the time he so operated. Appellant contends that the profit so made by appellee should be accounted for and turned over to the state.

As we read the record, there was no concealment or mis-understanding whatever between appellee and other state officials as to the business that appellee carried on in this manner, or as to the fact that he was conducting the same in his own interest and in his own behalf. No compulsion was used in any way by appellee in his official capacity. As far as we discover from the record, all persons seeking permits were treated absolutely alike, regardless of whether they sold fish to appellee or not. No one was required to sell fish to appellee at any price as a condition to obtaining any rights whatever from him, as fish and game warden. The State complains that in this respect there was one applicant for a permit to fish in a certain lake who was denied such permit, with the explanation that one had already been granted to another party to fish in said lake, and the facts disclosed that this was true, and that there had been previously issued a permit to another party to remove the fish from the lake referred to. There is nothing either illegal or suspicious about this transaction.

It is strenuously insisted in argument that appellee shipped fish under tags that bore his name and his official title as state fish and game warden. This is not denied; but the fact that appellee may have used tags that bore this official designation did not change the character of the ownership of the fish, nor does it lay him liable to the state to account for the proceeds thereof.

It is also contended that a few letters in regard to this fish business were written by appellee on official stationery furnished by the state, and that some of his mail pertaining to said business was delivered at his office, and that a few letters were dictated

by him to his official stenographer, in regard to the fish business. Even if this should not have been done, it does not entitle the state to an accounting for the profits of the business.

The evidence shows without any dispute that, in conducting this business, appellee used his own money, and not any of the money in any way belonging to the state. He assumed all of the risk connected with it, and the matters last referred to are so trivial in character, and the amount, if any, involved therein so inconsequential, that they are quite negligible in determining in any way the question of the right of the state to an accounting from appellee for the profits of the business. Public officials should be held to the most rigid accounting in regard to all public funds or public property intrusted to their care. There is no contention here that appellee neglected any of his official duties whatever, nor is there any claim that he misappropriated any of the property of the state. A public officer is not required to give every instant of his time to the public service in such a sense that he cannot, if wholly consistent with public duties, perform any other service or earn money from any other source. His first and paramount duty is to perform all of the requirements of his office; but he is not barred, because he holds public office, from investing his funds in a legitimate business enterprise, nor prohibited from receiving profits from an independent business in which he may have an interest.

In *Burlingame v. Hardin County*, 180 Iowa 919, referring to a county officer, we said:

"If, for example, he receives payment or fees as a witness in a civil action, or for service as one of a board of arbitrators, or as clerk of an election board, or as laborer in the harvest field, or indulges in literary work for which he receives more or less in royalties, or, being a merchant or banker or mechanic, wins profits wholly disconnected with the duties placed upon him by statute, no one would soberly contend that the county or any of its officers could rightfully lay claim to any part of the income or earnings so accruing."

The State lays great stress on the fact that appellee purchased a farm, and used, in part, the profits he made out of the fish business in the purchase thereof. If the profits belonged to

appellee, as we hold they do, it matters not whether he invested the same in a farm or what he did with the proceeds.

We have not attempted to review in this opinion each and all of the items of evidence that were produced by the State in a long trial, but we have carefully examined all of them, and, upon the entire case, we reach the conclusion that appellee, during his administration of office of state fish and game warden, was not shown to have received into his possession any public funds that have not been fully accounted for and turned over to the state, and that he should not be held to account to the state on any of the items sued upon in this cause.

The decree of the district court was right, and it is in all respects—*Affirmed*.

ARTHUR, C. J., EVANS and PRESTON, JJ., concur.