F. M. USHER, Respondent, v. WESTERN UNION TELEGRAPH COMPANY, Appellant.

Kansas City Court of Appeals, December 3, 1906.

1. **TELEGRAPH COMPANIES: Forged Dispatch: Negligence.** Telegraph company is only charged with ordinary care to avoid being imposed upon by forged telegrams. They are not insurers of their genuiness.

2. ———: ———: ———: **Agent.** A telegraph company, however, insures that its own agent has not forged a telegram and is liable for such forgery.

3. ———: ———: ———: ———. A principal is not liable for the acts of an agent willfully done beyond the scope of his employment but so long as the act is within the scope of his agency the company is liable though the act is a crime.

4. ———: **Agent: Evidence: Payment.** The evidence is reviewed and the station agent of a railroad that uses a wire of a telegraph company running into the station chiefly, however, for railroad purposes, is held to be the agent of the telegraph company, though not paid by such company.

5. ———: ———: **Forged Dispatch: Loss: Proximate Cause.** A telegraph agent at M received a dispatch signed by the company's agent at P addressed to S to pay certain money to F with certain guarantees from a bank. The dispatches and the guarantees were forged by the assistant of the agent at P. The assistant, personating F together with the agent at M presented the telegrams and guarantees to U representing that they were for the protection of anyone who would pay the money. U paid the money and sustained the loss. *Held*, the dispatches and guarantees were not the proximate cause of U's loss since they were not addressed to him and it was not the natural and probable consequence of the forged telegrams to S that U would be defrauded thereby and a new and independent cause, to-wit, the unexpected *communication of the telegrams to U*, intervened as the producing cause of U's loss.

6. ———: ———: ———: ———: **Representation.** The action of the agent at M in accompanying the assistant of the agent at P to see U and his representations that the telegrams were for the protection of anybody who paid the money, was beyond the scope of his agency and did not bind his principal, the telegraph company; and the agent's duty in delivering telegrams extends only to those to whom they are addressed.

7. ———: ———: **Duties of: Signor.** Men dealing with corporations of a public character such as railroads or telegraph companies are presumed to know the ordinary scope of the duties of the company's servant with whom the public is brought in daily contact.

8. **TRIAL PRACTICE: Death of Judge: Election by Bar: De Facto Judge.** Court adjourned on the eighth to the next day. Before the opening the judge died. On the morning of the ninth the court was adjourned until the tenth by reason of the death of the judge and on that morning an election was held by the clerk which resulted in the election of P, who assumed the duties and made an order that the time for allowing the bill of exceptions in this cause should be extended to the September term. *Held*, it is immaterial whether the action was within the statute controlling the election of a temporary judge since the bar proceeded under the belief of their power in electing P and he acted thereon and thereby became judge *de facto* and his acts are legal and valid.

9. **TELEGRAPH COMPANIES:** Forged Dispatch: Agent: Petition: Proximate Cause. A petition relating to a loss alleged to have been occasioned by the forging of a dispatch by an agent of the defendant is considered and held not to state a cause of action since the proximate cause of the loss was not the forged telegram.

Appeal from Barton Circuit Court.—*Hon. L. W. Shafer,* Judge.

REVERSED.

*George H. Fearons, Karnes, New & Krauthoff* and *Thurman & Timmonds* for appellant.

Filed argument.

*Cole, Burnett & Moore* for respondent.

(1) Even if it were possible for a bill of exceptions to prove itself, the pretended bill in this case actually impeaches itself. On page 63 of appellant's abstract the court will notice that the bill recites that on March 9, Judge L. W. Shafer extended time for filing the bill to May 10, 1906; on page 64 it is recited that Judge Shafer departed this life May 9, 1906, and that on May 10, 1906, the bar elected S. N. VanPool special judge, and that said pretended special judge, on May 10, 1906, made an order extending time to the first day of September term, and this must be the order referred to about the middle of page 63 as having been made on May 10, for of course Judge Shafer was then dead; it is further recited that after Judge Shafer's death the Governor did not fill the vacancy by appointment until May 26, when the Hon. J. B. Johnson was appointed, and that he signed said pretended bill on May 28, 1906. Revised Statutes 1899, section 1604; Bank v. Graham, 147 Mo. 250; State ex rel. v. Flournoy, 160 Mo. 332; Ladd v. Forsee, 163 Mo. 509. (2) Nor can it be said that Mr.

VanPool was a *de facto* judge. It is only "when the conditions upon which a temporary judge might have been appointed all existed," that there may be a de facto judge. State v. Miller, 111 Mo. 549; State v. Ross, 118 Mo. 42; Allen v. Snyder, 82 Mo. 259; State v. Eaton, 191 Mo. 151; State v. Shea, 95 Mo. 91. (3) Now in considering this case we must bear in mind the well-established law that a principal is liable for the fraud, neglect, or other wrongful act of his agent in the course of his employment, though the principal does not authorize the specific act, and even though it may be against his orders. Curtis v. Railroad, 99 Mo. App. 507; State ex inf. v. Ins. Co. 152 Mo. 37; Phipps v. Mallory Com. Co., 105 Mo. App. 67; State ex rel. v. Railroad, 149 Mo. 111.

ELLISON, J.—Plaintiff, claiming to have suffered pecuniary loss through the misfeasance of defendant's agent, brought this action for damages and recovered judgment in the trial court.

The city of Parsons, Kansas, and the village of Minden, Missouri, are about sixty miles apart. In each of them the defendant has telegraph operators who receive and transmit messages. In the former place it has what may be called a regular office and operator and it also has an equipment at the St. Louis and San Francisco railroad station into which what is known as the railroad wire enters; the latter being used mostly for railroad work. This equipment, at the time of plaintiff's loss, was in charge of the railway station agent, Knight, and his assistant, Connelly. The latter turned out to be a forger and swindler and used the telegraph wire in his scheme which resulted in his getting from plaintiff seven hundred dollars. The village of Minden is a small place without a bank and the few merchants there occasionally accommodated different ones of the public in cashing checks or drafts. Defendant's agent and operator at Minden was likewise the railway station agent and

also agent for an express company. Knight, as just stated, was the railway station agent at Parsons and he was also agent for the express company. Connelly, as expressed by the witnesses, "called" the agent at Minden and "talked" to him over the wire, personating his principal Knight, in which talk he gave the agent the false information that he had received a package containing a large sum of money from one F. M. Markham (a fictitious person) to be sent to Minden and that he, by mistake, had sent it to some other place and that when Markham called for it at Minden and found it had been missent, he would probably make trouble for the express company. He therefore (still pretending to be Knight) stated that he would send his own check for $700 to replace the money so missent and requested the agent to assist Markham in getting it cashed and asked him who would likely cash it. The agent answered that he would assist him and he thought Sanford Bros., merchants in the village, would cash the check. Connelly, in order to further his scheme then sent to the agent the following telegram in the name of Knight:

"Parsons Station, 26   190

"Agent, Minden, Mo.:

"Please help F. M. Markham cash check for seven hundred nine dollo in A. M. & notify me soon as done pls.                    W. C. KNIGHT."

And then also sent the following telegram, to Sanford Bros., forging the name of the Commercial Bank at Parsons:

"Mch. 26, 1905.

"Dated Parsons, Kas.

"To Sanford Bros.

"Minden, Mo.

"Honor W. C. Knight's check for seven hundred dollars advise when done & will remit.

"COM. BAK."

He then wrote the following draft and enclosed it in the following letter, forging the name of Knight to both:

"Parsons, Kansas, March 26, 1905. No. 27.
"PARSONS COMMERCIAL BANK.
"Pay to F. M. Markham or bearer $700.00, Seven Hundred Dollars. W. C. KNIGHT."

"Parsons, Kas., 3—26.
"Agt. Minden:

"Enclosed find check for $700, seven hundred dollars favor F. M. Markham pls help him cash it it's very important. W. C. KNIGHT."

He then described over the wire his own personal appearance to the agent at Minden pretending that it was a description of the fictitious Markham. He then took a train for Minden and presented himself to the agent as Markham near 9 o'clock p. m., whereupon the agent, taking along the forged letter and telegrams above set forth, went out with Connelly to the plaintiff, another merchant in the village whom they met on the street on his return from church. The agent, believing him to be so, introduced Connelly as Markham, and delivered to plaintiff the forged letter and telegrams including the one from the bank addressed to Sanford Bros. asking them to cash the draft. Plaintiff, stating that he could not look into the matter on the street, invited them to his house, whither all three went. Plaintiff read over the papers and remarked on the telegram from the bank being addressed to Sanford Bros. Whereupon both the agent and Connelly assured plaintiff that the telegram had been addressed to Sanford Bros. in the belief that they would cash the check, but that security was thereby intended for any one that would do so. The plaintiff then, in reliance upon the forged check and the telegrams being genuine and upon the assurances of the agent, as just stated, cashed the check and paid the

money over to Connelly, who left the country, and the bank at Parsons and Knight repudiating the check, the loss to plaintiff became manifest.

If this case was one where a forged telegram had been received by defendant's agent, its solution would not be difficult. For in such instance, the rule is that the telegraph company is only charged with the duty of ordinary care, judged from the standpoint of the nature of its business, to avoid being imposed upon by the forger. Such companies, in such instances, are not insurers. [Western Union Tel. Co. v. Ulvalde Bank, 97 Texas 219; Same case, 77 S. W. 603.]

But the case presents the novelty of the defendant's agent himself being the forger; and his act, it is claimed, was the proximate cause of plaintiff's loss. We may here parenthetically remark that we put aside the letter and telegram from Connelly to the agent at Minden as they can have no bearing on defendant's liability, as will more clearly appear further on; and we have only referred to them as a part of the history of the case. It ought to be plain to every one that if the telegraph company is under an obligatory duty to exercise ordinary care, through its agent, in protecting persons with whom it comes in business contact from forged or fraudulent telegrams, by stronger reason ought it to be held that a positive obligation rests upon it, to absolutely protect such persons in respect to its agent who is himself the swindler. The two obligations, at first view, look to be so near akin as to be substantially alike. While there is a difference, it is principally in the character or degree of the obligation. In the one the obligation upon the company is that its agent will be careful and prudent, the business considered, in guarding against imposition in sending forged telegrams. In the other there is an absolute assurance that the agent himself has not forged the telegram.

The argument against this absolute obligation and

liability of the telegraph company is that no principal ought to be, or can be, held for the willful wrong of his agent. And that, with an exception, we are satisfied is true. For it is apparent that a principal ought not to be held liable for the act of an agent who steps outside the boundary of his agency and commits a crime. The principal only stands for the conduct of his agent in those things where such conduct is connected with the agency, and that is the exception just noted. In other words, if the conduct of which complaint is made, though it be a crime, is within what is called the scope of the agency, or the course of employment, the principal is liable in a civil action. In such cases the principal holds out his agent as "fit to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency." [Story on Agency, sec. 452.] The law, thus stated, was applied to a case where the agent of a telegraph company himself wrote a telegram, purporting to be a check for $1,200, payable to a fictitious person, forging the name of a bank cashier thereto and sent it over the wire to a bank at a distant place. He then went to that place and by personating the fictitious payee, obtained the money. The company was held liable. [Bank v. Telegraph Co., 52 Cal. 280.] And it was likewise so applied where the agent of a telegraph company, who was also agent for an express company, sent a telegram which he had forged, to a merchant at a distant place, directing the merchant to send by express, a package of money which the agent intercepted and converted. [McCord v. Telegraph Co., 39 Minn. 181.]

We have treated the acts of Connelly, who was an assistant to the regular agent, Knight, as the defendant's agent, which includes the assumption that Knight was defendant's agent. We have also assumed defendant's liability for misfeasances occurring at the railroad station office at Parsons, though defendant had a reg-

ular office several blocks from the railway station. We consider that the evidence preserved (since the verdict was for the plaintiff) justifies us in so assuming. It was shown that Knight was the railroad station agent and that he was not paid by the defendant. It was shown that he was also in the employ of an express company. It was also shown that the wire running into the station was what was known as the railroad wire and was chiefly used for transmitting and receiving messages connected with the railroad's business. But it was furthermore shown that the equipment and the necessary supplies for operating a telegraph office were furnished by defendant and that the station agent of the railway company and his assistant not only transmitted and received railway messages, but also frequently accepted messages from the general public with defendant's knowledge and acquiescence and sent them over this wire leading out of the station, and turned the money collected therefor over to this defendant. We regard the showing as sufficient to make either Knight or Connelly the defendant's agent; and the circumstance of them receiving no pay from defendant as not controlling.

The foregoing considerations determine that the act of the agent at Parsons was an act for which defendant should be held liable, if it was the proximate cause of plaintiff's loss. And into that question we will now inquire.

We have already stated that the telegram was not directed to the plaintiff, but to Sanford Bros., merchants in the same village. Neither was it intended to affect the plaintiff or interest him in any manner. Plaintiff was therefore a stranger to the telegram and as such, can he claim that defendant has committed a breach of duty which was owing to *him?* On this subject we have been cited by counsel to a most interesting and instructive case written by Judge Sanborn of the United States

Circuit Court of Appeals, who discusses the question with such ability as to make a search for other authority unnecessary. [Western Union Tel. Co. v. Schriver, 141 Fed. Rep. 538.] It is not sufficient that a wrong — a breach of duty has been committed. As a crime such wrong might affect the plaintiff in common with other citizens, but in a civil sense, the wrong must be a breach of duty owing to the complaining party. Text writers state, that though "the defendant owed a duty, but did not owe it to the plaintiff, the action will not lie." [1 Shearman & Redfield on Negligence, sec. 8; Bishop on Non-Contract Law, sec. 446.] In the course of the opinion in the case to which we have just referred, Judge SANBORN said that "One who makes a representation owes no duty of care to tell the truth to those to whom he does not communicate it and to whom he does not anticipate that it will be conveyed, and a person of ordinary prudence and intelligence in his situation would not anticipate that it would be conveyed, and such parties have no cause of action against him for injuries they sustain by reason of the falsity of the representation. 'Courts will give appropriate redress or relief for actionable misrepresentation to any one to whom the same was made or for whom it was intended, and only to such.' [1 Bigelow on Fraud, p. 197, sec. 2; Slade v. Little, 20 Ga. 371, 374; Henry v. Dennis, 95 Me. 25, 49 Atl. 58, 85 Am. St. Rep. 365; Carter v. Harden, 78 Me. 528, 7 Atl. 392.] The reason is that the loss to him to whom the party who makes the misrepresentation does not communicate it, and cannot reasonably anticipate that it will be communicated, is not the natural or probable consequence of his act. It is the effect of an independent cause — of the unexpected conveyance of the misrepresentation to the third party by the person to whom it was originally made. Without this new cause, the injury to the third person would not occur and the intervention of this new agency, as Wharton felicitously

expresses, it 'insulates' the original act of negligence from the injury. [Wharton on Negligence (2 Ed.), sec. 134; Huset v. J. I. Case Threshing Mach. Co., 120 Fed. 865, 867, 57 C. C. A. 237, 239, 61 L. R. A. 303.]"

In view of the foregoinng considerations we have no hesitancy in holding the plaintiff to be without a right of action against the defendant, unless he is entitled to it by the following consideration urged by counsel, viz., that, as stated in the fore part of this opinion, defendant's agent at Minden went with Connelly to plaintiff's house and there delivered the telegram to him and assured him that it would protect him as well as the addressees.

It seems to us that such act of the agent was clearly outside the scope and course of his employment as defendant's telegraph operator. It would be altogether unreasonable — it would be a dangerous enlargement of the authority of a telegraph operator, to say that he might leave his office and go upon the streets with a stranger and bind his principal as a sort of surety for money borrowed by the stranger of one with whom the principal had no connection and in whom he had no interest and to whom he owed no duty. That is, practically, what is sought in this case; for there was nothing done by the agent when he went out with Connelly in quest of money which can be in anyway traced to authority from defendant, either express or implied. True, he delivered the telegram to plaintiff and a delivery of telegrams is undoubtedly a part of his employment, and if he delivers to a party not the addressee he may put a liability against his principal, but not in favor of the person who accepts such improper delivery, for no duty was owing to such person. Besides, such person must necessarily know that the agent is violating his duty to his principal, if not the law itself, in making delivery to one not addressed. It must have been equally manifest to plaintiff that the agent, merely by virtue of being

a telegraph operator, had no authority to bind the defendant by assurances that it would be obligated to any person receiving the telegram, though not the addressee. To allow such authority, in consideration of where it might lead, would go far towards making the operation of telegraph lines too hazardous for prudent men to undertake.

The loss to the plaintiff is to be regretted, for the part he took in the transaction seems to have been from a spirit of accommodation. But so far as concerns any features of the case which can legally bear upon defendant's connection with it, he was not deceived. He knew the telegram was not sent to him and he must have known, if he had thought a moment, that the defendant's agent was acting a part he had not been employed to perform. The remarks of Judge VALLIANT with respect to authority of a certain class of railroad agents are quite applicable to what we have written. He said that, "Men dealing with corporations of a public character like that of a railroad company are presumed to know the ordinary scope of the duties of a servant of the company with whom the public is brought into daily contact. They know the ordinary scope of the duties of a brakeman, a locomotive engineer, and a conductor. No man of ordinary common sense needs to be told that neither a locomotive engineer nor a brakeman has authority to make a contract in behalf of the corporation for the carrying of passengers, or to receive the price of carriage." [O'Donnell v. Railway, 95 S. W. 196.]

The foregoing disposes of the merits of the controversy; but plaintiff insists that defendant has not preserved a bill of exceptions. The point made involves a consideration of section 1679 of the Revised Statutes of 1899, which reads as follows:

"Whenever the judge from any cause shall be unable to hold any term or part of term of court, and shall fail

to procure another judge to hold said term or part of term" then a special judge may be elected by the attorneys present "to hold the court for the occasion." It appears that Judge Shafer was judge of the Barton Circuit Court before whom this case was tried. That on the 9th of March, 1906, the time for filing the bill of exceptions was extended by Judge Shafer to the 10th of May, 1906. A regular term of the circuit court for Barton county began on Monday, the 7th of May, 1906. Judge Shafer adjourned court on the 8th of May to the next day, but before the opening of court on the next day he died. Thereupon, on May 9th, the following entry of record was made:

"On the convening of court this morning at 9 o'clock there were present John Slavens, sheriff of this county, R. E. Casement, clerk of this court, George Rumsey, official stenographer, and the members of the bar, and it appearing that Hon. L. W. Shafer, judge of this circuit, had departed this life since the adjournment of court yesterday evening and it appearing that the court could not be held according to its adjournment, court stood adjourned till to-morrow morning at 9 o'clock." Then on May 10th, there was a record entry showing that it appeared that the judge of the court "was unable to hold court on account of his death, and no other judge having been procured to hold the remainder of this term an election was held by the clerk" of the court when the members of the bar elected S. N. Van Pool, Esq., one of their number, as special judge. Judge Van Pool then entered upon the duties of special judge and on that day made an order extending the time for filing the bill of exceptions from May 10th to on or before the next September term of court. Thereafter, on May 26th, the Governor appointed Hon. J. B. Johnson to fill the vacancy occasioned by the death of Judge Shafer and Judge Johnson then, on May 28th, signed the bill of exceptions as it appears in this court.

The point made involves the validity of the extension made by Judge Van Pool for filing the bill, since, if there was no extension, the after signing by Judge Johnson did not impart any validity to the bill. Plaintiff construes the statute as not authorizing an election of a special judge by the bar when the regular judge dies. In such case, he insists, there is a vacancy which must be filled by the Governor. We find that we are relieved of the necessity of giving construction to the statute from the following considerations.

It appears that Van Pool was elected by electors who were authorized to elect a special judge in certain contingencies. If we concede no such contingency as the statute contemplates had arisen, yet it is a fact that these electors, acting under a mistaken view of their right, did elect a special judge and that he assumed the duties of the office. He thereby became a judge *de facto* and his act in extending time for filing was a valid act. In State v. Carroll, 38 Conn. 449, it was laid down that, "An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid, so far as they involve the interests of the public and third persons, where the duties of the office were exercised (1) without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be; (2) under color of a known and valid appointment or election, but where the officer failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like; (3) under color of a known election or appointment, void because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power or defect being unknown to the public; (4) under color of an election or appointment by or pur-

suant to a public unconstitutional law before the same is adjudged to be such." The third of these rules applies to this case. That case is cited and strongly approved in Perkins v. Fielding, 119 Mo. 149, 159, and Simpson v. McGonegal, 52 Mo. App. 540. As bearing directly on this question, see State v. Lewis, 107 N. C. 967; Ball v. United States, 140 U. S. 118, and McDowell v. United States, 159 U. S. 596. We do not regard the phrase occurring in the opinion in State v. Miller, 111 Mo. 549, viz., "when the conditions giving the right of appointment existed," as meaning to interfere with the rule as stated in the cases just cited.

Furthermore, considering that plaintiff has set up in detail, substantially all the facts in his petition which he showed at the trial and upon which he relied for recovery, were are of the opinion that such petition failed to state a cause of action. The petition set forth, with particularity, the evidentiary facts upon which we have based our conclusion that he has not a cause of action. In such case the record proper is sufficient to authentically disclose the fatal defect and it may be taken advantage of on appeal though no objection has been made or exception taken. [Rixke v. Telegraph Co., 96 Mo. App. 406; Weil v. Green Co., 69 Mo. 281, 286; Hart v. Harrison, 91 Mo. 414, 420; Collins v. Collins, 53 Mo. App. 470.]

The judgment should be reversed and it is so ordered. All concur.