STATE OF MISSOURI 'at the relation of H. D. McGAUGHEY, Relator, v. CHARLES M. GRAYSTON.—163 S. W. (2d) 335.

Court en Banc, June 23, 1942.

*C. T. Craig* and *R. H. Davis* for relator.

*Allen McReynolds, Loyd E. Roberts, Roy Coyne, John Scott* and *Haywood Scott* for respondent.

704

 DOUGLAS, J.—The decision in this case turns on whether a judge of a circuit court who is called into the military service of the United States as a Colonel in the National Guard thereby vacates his judicial position.

 Ray E. Watson, Judge of Division One of the Circuit Court of Jasper County, was called into active service in 1940 as a Colonel of the Missouri National Guard in command of a Coast Artillery Anti-Aircraft regiment. In his absence the court has functioned through special judges as provided by law.[1] Nine hundred and ninety-four cases have been disposed of by these special judges.

Charles M. Grayston, Esq., of the Jasper County Bar, the respondent, was elected special judge by the lawyers to hold the January, 1942, term at Joplin. While in the exercise of his duties he was about to proceed with the case of McGowen v. McGaughey, a suit to recover $10,000 damages. The defendant objected to his jurisdiction to try the case on the ground there was no authority for his election as special judge under the existing circumstances. The objection was overruled and defendant, as relator comes to this court for prohibition.

 In this State a special judge is a judge de facto.[2] Usually the authority of a *de facto* judge may be determined only in a quo warranto proceeding and not by way of prohibition to prevent him from doing an official act.[3] But there is an exception in the case of a special judge which permits challenging his authority in the case before him. If a party to the cause makes timely objection to the authority of a special judge and the objection is improperly overruled, the ruling is error and subject to review on appeal.[4] Therefore, prohibition would not ordinarily lie.

---

[1]Sec. 2105, R. S. 1939.

[2]State v. Miller, 111 Mo. 542, 20 S. W. 243; Usher v. Western Union Tel. Co., 122 Mo. App. 98, 98 S. W. 84; cf. Scott & Colbern v. Joffee, 125 Mo. App. 573, 102 S. W. 1038.

[3]30 Am. Jur., Judges, sec. 102.

[4]30 Am. Jur., Judges, sec. 108; Lacy v. Barrett, 75 Mo. 469; Field v. Mark, 125 Mo. 502, I, 28 S. W. 1004; In re Drainage District v. Richardson, 227 Mo. 252.

■ In view of the urgency of the question presented and the demand of the public interest for its speedy determination, we will exercise the discretionary right to decide it in this proceeding on authority of State ex rel. Dunlap v. Higbee, 328 Mo. 1066, l. c. 1070, 43 S. W. (2d) 825. That was a prohibition case involving a special judge where we found the same situation which exists here, namely the question presented was one of error and not of jurisdiction. However, we decided since we had already taken jurisdiction of the case to proceed to a final determination.

■ Relator contends that Judge Watson as a National Guard Colonel in Federal service accepted ''an office of profit under the United States'' while holding a State office which is forbidden by our Constitution. As a result, he insists, Judge Watson has forfeited his judgeship under the rule that the acceptance of a second office which is forbidden or incompatible to the office already held ipso facto vacates the first office. Therefore, if there is a vacancy in the office of circuit judge as distinguished from an absence, a special judge has no authority to act and his jurisdiction may be properly challenged.

Historically the ''militia'' or ''militiamen'' have been held to comprehend every temporary citizen-soldier who in time of war or emergency forsakes his civilian pursuits to enter for the duration the active military service of his country. The term ''militia'' was not used as restricted to the National Guard. Its early usage applied to each and every able-bodied citizen between the ages of 18 and 45.[5] By our present Constitution it is the same today.[6]

Article XIV, Sec. 4 of our Constitution provides: ''No person holding an office of profit under the United States shall, during his continuance in such office, hold any office of profit under this State.''

When Judge Watson was ordered into Federal service as Colonel of the Missouri National Guard was he then ''holding an office of profit under the United States'' within the meaning of this provision? It is our conclusion, and we so decide, that this provision was never intended to apply and does not now apply to the militiaman who enters the service of his country in time of emergency or war.

■ In determining the meaning and extent of a constitutional provision the reason for its adoption must be borne in mind. Therefore, we may look to the history of the times and the conditions existing when the Constitution was framed and adopted.

This provision was first adopted in 1822[7] among the first amendments to our first State Constitution and has been carried on by our Constitution of 1865 and by the present one. Its adoption was an

---

[5]Laws 1825, p. 533.

[6]''All able-bodied male inhabitants of this State between the ages of eighteen and forty-five years, who are citizens of the United States, or have declared their intention to become such citizens, shall be liable to military duty in the militia of this State . . . .'' Art. XIII, Sec. 1.

[7]Laws 1825, p. 66.

evidence of the then existing strong jealousy of the rights of the State and a fear of domination by the Federal government in local affairs. This feeling had led to the enactment or adoption of a provision in all respects similar to this by the states generally.[8] No division of interest or allegiance was to be countenanced in permitting one person to hold office under the two governments at the same time.

Another manifestation of this concern was the retention of the control of the militia by the states in the Federal Constitution. This came only after bitter debate during the Constitutional Convention. Art. I, Sec. 8 gave the National Congress power to provide for calling out the militia "to execute the laws of the Union, suppress insurrections and repel invasions;" also for governing such part as might be employed in the service of the United States; but expressly reserved to the states the appointment of the officers and the authority of training. Then to be doubly sure the control of the militia was in the states, the second amendment was adopted. It provided: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."

In the Revolutionary War a great part of the forces was made up of the Colonial Militia. Its soldiers were regarded primarily as troops of the respective colonies from which they came. The same was true of the State Militia in the War of 1812 when 100,000 militiamen were mustered in the national service. Even being in national service in the time of war did not change the provincialism of the militia.

Thus, at the time of the adoption of our constitutional provision above set out, a militiaman was considered as being a state trooper even when called for national duty. Construing a like constitutional provision the Supreme Court of Pennsylvania said, in effect, that such a provision was never intended to apply to a militiaman in public service. In developing the reason for its decision that the office under consideration was not a Federal office, it stated: "Every militia man who is called into public service is directly employed under the executive. Was it ever heard of that a justice, constable, burgess or alderman was exempted from the muster roll because service under the United States was incompatible with his State office?" This statement is in line with the common attitude of the early days toward the militia. "Settlers brought to America with them the militia idea, that all men 'joined in some measure,' as Adam Smith said, 'the trade of a soldier to whatever other trade or profession they happened to carry on.' It was tied to traditional fears of standing armies, in ancient as in British history the tools of the despotic rulers . . . Militia men required 'for the common defense' were to be requisitioned by the President only in emergencies and through the governors according to State quotas. An Act of May 2, 1792 (1 Stat.

---

[8]Com. v. Dallas, 4 Pa. 218; Com. v. Ford, 5 Pa. 67.

259), reenacted Feb. 28, 1795, authorized the President to call federally 'such number of the Militia of the states most convenient to the scene of action, as he may judge necessary.' '"[9] Likewise in the early days of St. Louis, militia service was to be kept from becoming burdensome to the citizens so they could continue in their trades.[10]

The separate identity of the militiaman as distinguished from the professional soldier who makes up the Regular Army was carried on long after the adoption of this constitutional provision and was recognized and observed in the Civil War and in the Mexican Border Service in 1916 and in the first World War. This was also the case when, in an effort to avoid the restrictions on the use of the militia units, the "National Volunteers" were called for the Mexican War in 1846-8 and the Spanish-American War in 1898. In the war with Spain the Missouri militia units volunteered en masse and each unit of the militia became the identical unit in the ▮▮▮▮ volunteer service.[11] In the Mexican War, Colonel Doniphan led a large number of Missouri troops on one of the most remarkable expeditions in modern military history.[12]

It must follow that the provision before us has no application to a militiaman even though he is employed in the service of the United States during times of emergency or war.

The Illinois Supreme Court in 1924, considering an almost identical constitutional provision, decided otherwise.[13] In the last war the City Attorney of East St. Louis enlisted in the Illinois National Guard after it was inducted into Federal service to serve for the period of the emergency. He was commissioned by the Governor of Illinois as a Captain. The court held that by becoming an officer employed in the Federal service he was not a member of the militia but was a member of the United States Army and thereby was rendered ineligible to hold his State office.

On the other hand a Kentucky case on identical grounds is in accord with our decision.[14] Under a similar constitutional provision it held that a circuit clerk did not lose his office because he went into the military service of the United States as a national guard captain of Coast Artillery Anti-Aircraft, under the same presidential order we have here.

A decision of the Supreme Court of California also supports our

[9]III Dict. Am. Hist., Militia, 403.
[10]1 Houck's History of Mo., 300.
[11]Missouri Military Reports, 1916, p. XXII.
[12]Ency. Mo. History "Doniphan's Expedition;" Rader's Hist. of Mo. (1927) Sec. 101.
[13]Fekete v. East St. Louis, 315 Ill. 58, 145 N. E. 696, 40 A. L. R. 650.
[14]Kennedy v. Cook (Ky.), 146 S. W. (2d) 56, 132 A. L. R. 251. See also the discussion in Carpenter v. Sheppard, 135 Tex. 413, 145 S. W. (2d) 562, where because of a constitutional amendment a national guard major in the Federal service kept his State office.

views.[15] In an action to determine title to office that court held, under a similar constitutional provision, that a major in the Marine Corps Reserve did not lose his office of county construction engineer upon being called to active duty. It found that such a constitutional provision was not applicable to the temporary citizen-soldier. Discussing an almost identical provision it said: "It was never the intent or purpose of . . . the Constitution of this State to discourage public employees from rendering military or naval service, to deter them from answering, or induce them to evade such a call, or to tend to impede the federal government in its effort to mobilize the citizenry, or interfere with efforts to meet a major emergency. The constitutional provision can neither be construed nor applied to effect such a result."

A Louisiana decision is in harmony.[16] It involved the application of a similar provision to a jury commissioner who was appointed a member of the local draft board in the last war. It held that such a provision could not have intended that a State officer should forfeit his office by service which law and patriotism demanded of him in time of war.

A Virginia case holds that a member of the Virginia National Guard retains his status as such when in the Federal service and is entitled under the Virginia code to retain his office as councilman.[17]

There are recent decisions to the contrary in Pennsylvania and Arizona.[18] There are earlier decisions also to the contrary.[19]

Although our constitutional provision is no bar against a circuit judge retaining his office while in active military service as a militiaman, we must look further and ascertain whether there is any common law incompatibility in holding both offices. The settled rule of the common law prohibiting a public officer from holding two incompatible offices at the same time has never been questioned. The respective functions and duties of the particular offices and their exercise with a view to the public interest furnish the basis of determination in each case. Cases have turned on the question whether such duties are inconsistent, antagonistic, repugnant or conflicting as where, for example, one office is subordinate or accountable to the other.[20]

The rule against holding incompatible offices is founded upon principles of public policy.[21] Let us look elsewhere in our Constitution for that public policy. Our Constitution specifically permits mem-

[15]McCoy v. Board of Supervisors of Los Angeles County (Cal.), 114 Pac. (2d) 569.

[16]State v. Joseph, 143 La. 428, 78 So. 663.

[17]City of Lynchburg v. Suttenfield, 177 Va. 212, 13 S. E. (2d) 323.

[18]Commonwealth v. Smith, 343 Pa. 446, 23 Atl. (2d) 440; Perkins v. Manning (Ariz.), 122 Pac. (2d) 857.

[19] See Annotation 26 A. L. R. 142.

[20]See Annotation L. R. A. 1917A, 216.

[21]State ex rel. Walker v. Bus, 135 Mo. 325, 36 S. W. 636.

bers of the General Assembly also to be militia officers although prohibiting them from holding other public offices.[22] It also specifically permits other State and municipal officers to be officers of the militia at the same time.[23] In these instances there is no exception made when the militia is called into the service of the United States as there is in the case of the Governor in his capacity as commander-in-chief of the militia.[24]

Accordingly we find there is no legal incompatibility in holding both offices.

We would recognize as incompatible service in the Regular Army as we understand that term to denote the professional, permanent soldiery, those who have chosen the military service as a career. They should be distinguished from the militiamen who are ordinarily occupied in the pursuits of civil life but are organized for discipline and drill and called into the field for temporary military service when the exigencies of the country require it and from the citizen-soldiers who are in the military services only in time of war or emergency.

We notice briefly the development of military training for civilians and hold that it in no way has affected or changed this distinction. As the need for uniform training became recognized the militia was classified into the Organized Militia and the Reserve Militia. The Organized Militia became the National Guard and was trained with Federal funds. Next was created the National Guard Reserve. The Officers' Reserve Corps, the enlisted Reserve Corps, the National Army and the Organized Reserves were organized. The National Defense Act observes these units as disinct from the Regular Army. Regardless of name, these units are composed of persons who are primarily civilians. The fact that they leave their civil pursuits to take up arms for their country during the time of emergency or war does not make them professional soldiers.

The relator here has not contended that the common law rule, that two offices are not incompatible merely because the duties of both cannot be performed simultaneously, has been changed by Article II,

---

[22]Art. IV, Sec. 12 . "No Senator or Representative shall, during the term for which he shall have been elected, be appointed to any office under this State, or any municipality thereof; and no member of Congress or person holding any lucrative office under the United States, or this State, or any municipality thereof (militia officers, justices of the peace and notaries public excepted), shall be eligible to either house of the General Assembly, or remain a member thereof, after having accepted any such office or seat in either house of Congress."

[23]Art. IX, Sec. 18. "In cities or counties having more than two hundred thousand inhabitants, no person shall, at the same time be a state officer and an officer of any county, city or other municipality; and no person shall, at the same time, fill two municipal offices, either in the same or different municipalities; but this section shall not apply to notaries public, justices of the peace or officers of the militia."

[24]Art. V, Sec. 7. "The Governor shall be commander-in-chief of the militia of this State, except when they shall be called into the service of the United States. . . ."

Section 18 of our Constitution.[25] This section states an officer must personally devote his time to the performance of the duties.

In the first place this is not an action in quo warranto, against the officer himself, to forfeit his office for failure to do his duty, and in which he would be entitled to his day in court to defend his character and his record and explain whatever action he has taken, instead of having these matters decided behind his back in a proceeding to which he is not a party. And the Soldiers' and Sailors' Relief Act, requiring an affidavit that the defendant is not in military service before the court can proceed, is therefore not involved in this case as presented and argued here. Secondly, this section of our Constitution cannot sensibly be construed to mean that every judicial action in a particular court must be performed personally by the regular judge of that court. If so, when a regular judge became "unable to hold any term or part of a term of court" the functioning of the court would be immediately blocked because of such inability. Temporary means for carrying on the functions of an office by another are commonly provided. If such a construction were to be followed, the statutory provision for special judges would be meaningless. Furthermore, such a construction would be contrary to the constitutional power of substitution in case of absences.[26]

The constitutional provision requiring personal performance was intended for another purpose. It was designed to prevent "farming out" the performance of the duties of an office to another for the convenience or profit of the officer.[27] Temporary performance of the duties of a special judge are governed by law, not by the wishes of the regular judge.

The situation we are considering is analogous to a leave of absence as that term is understood in the business world. The common meaning of the term signifies temporary absence from duty with an intention to return, during which time remuneration is suspended.[28] We note with approval that Judge Watson has not drawn or received any salary as circuit judge since December, 1940. The fact that Judge Watson is unable personally to perform his judicial duties

---

[25]Art. II, Sec. 18. "That no person elected or appointed to any office or employment of trust or profit under the laws of this State, or any ordinance of any municipality in this State, shall hold such office without personally devoting his time to the performance of the duties to the same belonging."

[26]Art. VI, Sec. 29. "If there be a vacancy in the office of judge of any circuit, or if the judge be sick, absent, or from any cause unable to hold any term or part of term of court, in any county in his circuit, such term or part of term of court may be held by a judge of any other circuit; and at the request of the judge of any circuit, any term of court or part of term in his circuit may be held by the judge of any other circuit, and in all such cases, or in any case where the judge cannot preside, the General Assembly shall make such additional provision for holding court as may be found necessary."

[27]State ex rel. Tilley v. Slover, 113 Mo. 202, 20 S. W. 790; 1 Debates Cons. Conv. 1875 440. And see State v. Yager, 250 Mo. 388, 157 S. W. 557.

[28]See McCoy v. Board of Supervisors, supra; cf. Public Resolution 96, infra.

while in military service does not make his holding both offices incompatible under the circumstances. If the law did not permit a substitute to carry on the duties of the office in his absence a different question might be presented. We need neither discuss nor decide that.

Judge Watson was in a position to render trained service to his country. He was a veteran, a proved soldier. He had served his country with bravery and distinction overseas in the last war. He had been awarded the Distinguished Service Cross, the French Croix de Guerre and the Order of the Purple Heart. When he returned home he continued military training in the National Guard. He was a captain when first elected circuit judge. He was reelected by the people of his circuit while absent in his present active service.

Every citizen, the untrained as well as the trained, owes to his government the duty to render military service in time of need.[29] In order to survive it is necessarily the policy of the State law to aid, not impede our common defense.

All citizens should be encouraged, however possible, to aid their country. This is the National policy. Congress has said that National Guardsmen, entering from Federal employment will be restored to their civilian positions and asks private employers to make the same assurance where possible.[30] This is all out war where "every single man, woman and child is a partner in the most tremendous undertaking of our American history."[31] More man power is needed than ever before. Women are filling the depleted ranks in defense industries. No man should be hindered in helping his country.

Whether filling a civil governmental office renders service as necessary as military service is not a question for the courts.

The situation involved in this case presents practical considerations which may call for action by our Legislature or by the people in amending the Constitution. The court can but take the law as it finds ▊ it. And until either the Legislature or the people do adopt some new provision applicable to such situation, all the court can say is: Let no citizen be penalized because he is a patriot. Let us keep faith with those who fight for us. The motto on our great seal of State proclaims this. "Let the Safety of the People be the Supreme Law."

Our writ in prohibition shall not issue. All concur except *Gantt, J.*, not sitting.

[29] Arver v. United States, 245 U. S. 366, 62 L. Ed. 349.
[30] Public Resolution 96, Acts 76th Congress.
[31] President Roosevelt, Address to the Nation, December 9, 1941.