State ex inf. J. E. TAYLOR, Attorney General, Relator, v. MARVIN M. CUMPTON, Respondent, No. 41996—240 S. W. (2d) 877.

Court en Banc, June 11, 1951.

Rehearing Denied, July 9, 1951.

*J. E. Taylor*, Attorney General, *Gilbert Lamb* and *Richard F. Thompson*, Assistant Attorneys General, for relator.

*Walter A. Raymond* and *Robert L. Spurrier* for respondent.

DALTON, J.—Original action in quo warranto commenced in this court to oust the respondent from the office of county treasurer and ex officio collector of Bates County on the ground that he had forfeited his office by his alleged willful failure, neglect and refusal to perform the duties of said office "as .such duties were and are imposed and required by law."

After the respondent had filed a motion to dismiss the proceeding and an answer, we appointed Hon. Ray Weightman, Special Commissioner to hear the evidence and report his findings of fact and conclusions. of law. The commissioner, so appointed, has filed his report recommending that all relief sought by relator be denied, and that judgment be entered in favor of respondent.

The information alleged that respondent was duly elected to said office, had qualified, was duly commissioned and sworn, and had assumed the duties of said office on April 1, 1949, but charged that on and after April 1, 1949 respondent had "failed to attend to the duties of said office during the usual business hours for the transaction of business therein and failed personally to devote his time to the performance of the duties of such office of county Treasurer and Ex Officio Collector and did and does willfully neglect and refuse to perform the official acts and duties which by law ·it was his duty to do and perform. * * * that on or about the 14th day of March, 1949, respondent entered into a contract of employment with what is known to relator as Skelly Oil Company, * * * so that on and after April 1, 1949 the performance of his duties thereunder occupied and consumed substantially the entire working time of repondent, including the usual business hours aforesaid, * * * ." The information further alleged that "respondent has long since forfeited his right to hold, occupy, or to receive the emoluments of, the office aforesaid * * * ," and prayed that he "be ousted from. occupying said office * * * ."

It is admitted that Bates County is a political subdivision of this state, to wit a county of the third class, with a population of approximately 20,000; that township organization has been adopted in the

county; and that respondent was duly elected and had assumed the duties of his office as alleged. The execution of a contract with Skelly Oil Company was admitted, but respondent denied that his duties under said contract occupied his entire working time. Respondent further denied that he had "failed, neglected or refused to attend his said office or to attend to the duties thereof or to personally devote his time to the performance of the duties thereof." He alleged that "all of the duties of the County Treasurer and Ex Officio Collector of Bates County, Missouri have been and are now being performed by him personally or under his immediate supervision and direction."

In reply to particular allegations in the answer, relator admitted that "respondent is personally present in charge of said office all day long on Saturday of each week"; and "that respondent frequently works in said office of County Treasurer before office hours, after office hours and on Sundays and holidays."

Relator's evidence relates to two matters: (1) the activities connected with the actual operation of respondent's office and respondent's connection therewith; and (2) the activities connected with respondent's employment by the Skelly Oil Company and the time given to that work. There was little or no conflict in the oral testimony presented before the special commissioner concerning the actual operation of respondent's office and his connection therewith whether the testimony was offered on behalf of relator or respondent. The evidence tended to show that respondent was first elected county treasurer and ex officio collector of Bates County at the general election in 1944 and was re-elected in 1948. Mrs. Fern Bolen became his deputy in 1945 and was "bonded," as such, and she has continued in the office in the same capacity with respondent since that date. In this connection we may say that relator insists there is "absolutely no legal basis for having a deputy in that office, and certainly no statute authorizing it." We think it is immaterial to any issue in this case whether she was legally an official deputy or only an assistant. It is clearly immaterial as far as relator's position is concerned. See State ex rel. Tilley v. Slover, 113 Mo. 202, 206, 20 S. W. 790.

Mrs. Bolen was well prepared for her work. She had finished high school and taken two years college work. She had taught school for five years and for four years she was the bookkeeper for a drug company. She had had four years experience acting as deputy county treasurer and ex officio collector of Bates County prior to April 1, 1949, the beginning of the period here involved. She received a salary of $175 per month, of which sum Bates County paid her $125 per month as clerk hire, and respondent paid the balance. She was in the office each week day, except Saturday and occasionally on Saturdays. The office was kept open from 8:30 to 12 a.m., and from 1 to 5 p.m., which hours corresponded with the hours other

offices were kept open in the court house. In this connection the special commissioner found the facts to be that Mrs. Bolen was "a lady of superior mentality, thoroughly familiar with all the work of the office and entirely capable of running the office even without advice or supervision. The records of the office were in excellent order and all the functions of the office were being well performed." Other county officials testified that the work of the county treasurer's office was done promptly and efficiently so as to coordinate with the work of the other offices. No citizen testified to any defect or deficiency in the service rendered by such office.

From the second week in March 1949 to the end of that year, Mr. C. H. McNay also worked in respondent's office, six days per week, at a salary of $200 per month paid by respondent. Mr. McNay had been a printer and publisher and, for five years, postmaster at Butler. Relator called Mrs. Bolen as a witness in his behalf and undertook to show by her "the multitudinous duties of the county treasurer and ex officio collector of Bates County, the extent and complexity of the statements of monthly collections, the monthly reports of moneys due from the ex officio collector to the state director of revenue and the monthly settlements prepared and filed in the office of the county clerk of the county, as well as the books and bookkeeping required in respondent's office and numerous other duties to be performed. We need not review this evidence because, as the special commissioner found, "there is no substantial evidence in the record that the duties of such office are not properly performed." No evidence tended to show any irregularities in the bookkeeping, reports, or settlements or that the work of the office was not efficiently and properly conducted.

The evidence tended to show and the special commissioner found that for more than 20 years there had been a bonded deputy county treasurer and ex officio collector in Bates County; and that it had been customary throughout that time for such deputy to sign checks, execute instruments and do practically all types of work pertaining to such office. Respondent was in his office in the court house every Saturday for the entire day with a possible exception or two. When he was away Mrs. Bolen was there. He spent most nights at his home in Butler. He picked up the mail at the post office almost every morning, took it to his office in the court house, read it and either answered it or instructed Mrs. Bolen how to answer it. About 90% of all mail received, and all the important mail received by the county treasurer, comes in during the night and is delivered in this first morning mail. Respondent ordinarily remained in the office from one to three hours, dependent upon the matters that required his attention. He stayed in the office "practically all the days that the township collectors settle" with the county court and make payment to the treasurer, to wit, the first five days of December, January, February and March. During the period from May 1, to July 1, 1949, respond-

ent was in his office about one-half of the time the office was open. After that respondent was in the office "most mornings and sometimes in the afternoon and other parts of the day and all day on Saturday." During the period from July 1, 1949 to April 1, 1950 respondent spent an average of 17 to 18 hours per week in his office in the court house. When respondent was out of the office, his deputy knew where and how to reach him on the phone if he was needed.

Respondent was present almost always when the county court was in session. He checked and approved all monthly settlements with the county court and usually presented them in person. He also personally checked and approved all reports to the state or county court, although in 11 out of 12 instances the reports to the state were signed on respondent's behalf by Mrs. Bolen. Respondent personally signed all liquor and pool hall licenses and all but a few of the merchant's licenses. He personally handled all tax sales, signed all certificates of purchase and personally filled out and signed all tax deeds. Of 1953 checks, for a total of $700,158.81, written in respondent's office during the period of one year, 921 of them for a total of $303,625.00 were personally signed by respondent. Respondent's handwriting appeared on 26 out of 57 pages of the cashbook. There was evidence and the special commissioner found that all duties of respondent's offices involving any discretion were either ▮▮▮ performed personally by respondent or under his direct supervision so that they would have his personal attention.

On March 14, 1949, respondent signed a contract of employment with the Skelly Oil Company. During the period from March 14, to July 1, 1949, his position was designated as district manager in training and after July 1, as district sales manager of the Butler, Missouri district of the Skelly Oil Company. The district consisted of parts of Cass, Bates, Henry, Pettis, Vernon and St. Clair counties. Respondent's salary was fixed at $225.00 per month plus certain commissions and bonuses, and during the period from April 1, 1949 to April 1, 1950, he received $3792.30 as a compensation for his services. The assistant retail division manager of the Kansas City division of the Skelly Oil Company was used as a witness by relator to outline in great detail the duties connected with respondent's employment by that company. These duties included the general supervision of the lessees of service stations, tank agents, and dealers for Skelly Oil Company in the Butler district, counseling them and making recommendations and suggestions, the contacting of prospective dealers, making contracts with contractors and equipment men, securing lessee replacements, some sales work and the making of daily reports of the time spent in the service of the company and the expenses incurred. Weekly route sheets were filed in advance with the company. Commissions were based upon sales in the territory. There was no set policy as to the days or hours respondent should spend in his work.

The company was interested only in seeing that the territory was properly operated. The company knew that respondent was a county official and was satisfied that neither position would interfere with the other. There was no requirement that, while traveling, respondent should stay all night in the territory, but occasionally he did so. He was reimbursed for hotel, meals and traveling expenses. He was expected to contact each lessee every five or six weeks and to attend at least three meetings in Kansas City. He usually visited the Kansas City office once every two or three months.

Relator offered in evidence the daily reports filed by the respondent with the Oil Company. These were in respondent's handwriting and were admitted to be correct. It is upon these exhibits that relator chiefly relies. Some forty pages of relator's printed brief is devoted to a detailed review of the information contained in these reports. It is obviously impossible, within the bounds of this opinion to review or even summarize the detailed information contained in these exhibits, nor shall we attempt to do so. Only a few facts will be referred to. These exhibits indicate that from May 1, 1949 to March 31, 1950 respondent made some 835 calls on prospects, lessees, tank agents and customers; that he spent 771 hours selling, 1374 hours "operating" and 360½ hours driving for the Oil Company; and that he incurred expenses as follows: Meals $489.55, room $180.68 (some 56 nights lodging), miscellaneous expenses $261.69 and automobile expenses $377.01. Relator construes the exhibits as showing 279 working days, within the period mentioned, and as evidencing that respondent spent about 4.9 per day on the average in "operating."

The evidence shows and the special commissioner found that these reports do not state what hours of the day the Skelly Oil Company work was done, and in almost all cases it could well have been done outside office hours. They do not often show where the work was done. "Operating" as used in these reports includes making out reports, taking care of correspondence, taking care of postings and using the telephone to contact lessees and bulk station employees and customers and prospective customers, much of which was done at respondent's home at other times than office hours, and sometimes done at his office in the court house. Furthermore, no report was made for Sunday although respondent usually did work for the Skelly Oil Company on Sunday. The daily reports did not include Sunday. The time worked on Sunday was added to reports for work days of the succeeding week. The reports do not directly contradict the witnesses. The special commissioner, having seen and observed the witnesses and heard them testify, was convinced of their truthfulness and believed their statements "as to the time spent by respondent in the county treasurer's office and the duties he personally performed there.

■ Respondent contends that quo warranto is not a remedy available to relator under the facts of this case to remove respondent from the office in question; and that the attorney general is not authorized to institute or maintain this action as relator.

Respondent's theory is that Sec. 106.230 RSMo 1949 designates the prosecuting attorney as the party to bring an action to enforce the provisions of Sec. 106.220 RSMo 1949; that an action cannot be maintained by the attorney general except upon the occurrence of the conditions precedent specified in Secs. 106.230 and 106.250 RSMo 1949; and that, as there is no allegation or proof in this record that an affidavit, as provided for in Sec. 106.230, has been filed in the office of the circuit clerk and the prosecuting attorney or special prosecutor has refused to file a complaint, relator cannot maintain the action. Respondent says "the cause for which respondent is here attempted to be removed is a new cause for removal created by a statute which provides the *exclusive* remedy for its enforcement." (Italics ours). See Osagera v. Schaff, 293 Mo. 333, 240 S. W. 124, 127; State ex rel. Major v. Wood, 233 Mo. 357, 377, 135 S. W. 932. Respondent argues that, while the attorney general possesses all the power and authority appertaining to the office under common law and naturally and traditionally belonging to it, nevertheless the General Assembly may and has withdrawn certain of these powers and assigned them to others. State ex rel. Barrett v. Boeckeler Lumber Co., 302 Mo. 187, 257 S. W. 453, 456.

Relator concedes that the charges upon which he seeks to oust respondent from his official position are based entirely upon an alleged violation of Secs. 106.220 and 54.100 RSMo 1949. Section 106.220 provides: "Any person elected or appointed to any county, city, town or township office in this state, except such officers as may be subject to removal by impeachment, who shall fail personally to devote his time to the performance of the duties of such office, or who shall be guilty of any willful or fraudulent violation or neglect of any official duty * * * shall thereby forfeit his office, and may be removed therefrom in the manner provided in sections 106.230 to 106.290." Section 54.100 provides: "The county treasurer shall keep his office at the county seat of the county for which he was elected, and shall attend the same during the usual business hours * * * ." A special penal section, to wit, Sec. 13842 RSMo 1939, which formerly applied to Sec. 13798 RSMo 1939 (now Sec. 54.100) no longer applies. See Sec. 50.320 RSMo 1949.

Relator cites State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S. W. (2d) 941, 944 in support of his position that the remedy provided by Sec. 106.230 et seq. is not exclusive. Respondent seeks to avoid the holding in the Wymore case, supra, on the ground that the charge in that case was good at common law, even absent the statutes there referred to. We think it is apparent from the opinion in the

Wymore case that the holding on the issue mentioned was not conditioned upon the fact that the charge would have been good at common law, absent the statute referred to. In the Wymore case the court said: "Respondent argues that the remedy provided by this statute (Sec. 11202 R. S. 1929 which is now Sec. 106.220 RSMo 1949) is an exclusive remedy against respondent for misconduct. On reading the article it will be noted that the words 'may' and 'shall' are used many times in the several sections. They were used advisedly and must be given their usual and ordinary meaning. It is the general rule that in statutes the word 'may' is permissive only, and the word 'shall' is mandatory. If so, said remedy is not exclusive, for it is provided in Sec. 11202 that the offending official 'may be removed therefrom in the manner hereinafter provided.' In other words, under the statute, the offending official 'forfeits by the act forbidden' [State ex inf. v. Ellis, 325 Mo. 154, 161, 28 S. W. (2d) 366] and is the subject to any remedy available to the people. The said Sec. 11202 having created and declared a forfeiture 'by the act forbidden,' the legislature could not and did not attempt to limit the jurisdiction of this court in quo warranto. It is without authority to do so." (Parentheses ours). And see State ex inf. McKittrick v. Williams, 346 Mo. 1003, 144 S. W. (2d) 98, 101.

Of course this court may properly issue and determine original remedial writs, including writs of quo warranto. Article V, Sec. 4, Const. of Mo. 1945; State ex inf. McKittrick v. Wymore, supra. Quo warranto is a proper remedy to determine title to a public office and the court having jurisdiction of the quo warranto proceeding may determine the question of forfeiture. If the issue of forfeiture is sustained, ouster may be ordered. State ex inf. McKittrick v. Wymore, supra, and authorities there cited. Whether or not respondent, as county treasurer and ex officio collector of Bates County, has forfeited his office by reason of the violation of the express provisions of Secs. 106.220 and 54.100, supra, is a matter of general public interest. Certainly the public generally is concerned as to whether these statutes have been violated by respondent. While there is no charge here and no evidence whatsoever that any taxes or other public funds collected on behalf of the state and due the state have not been transmitted or that all public funds have not at all times been properly and legally handled and disbursed according to law and, while there is no charge and no evidence that any single duty connected with the internal management, control and operation of said office has not been fully discharged by some one, yet the public interest remains as to whether or not respondent has forfeited his office for other reasons. We must hold that the public interest is involved in this case and the proceeding properly instituted by the attorney general. Sec. 27.060 RSMo 1949; State ex inf. McKittrick ex rel. City of Campbell

v. Arkansas Missouri Power Co., 339 Mo. 15, 93 S. W. (2d) 887, 892; State ex rel. Taylor v. Wade, 360 Mo. 895, 231 S. W. (2d) 179, 182.

The information filed admits that respondent was duly elected and thereafter qualified and became legally vested with said office. Ouster is sought on the ground of forfeiture for misconduct, as charged. In view of the issues made by the pleadings the burden of proof rested upon relator to show that respondent by willful neglect of his official duties or willful refusal to perform the duties of his office had forfeited the same. State ex inf. Miller v. St. Louis Union Trust Co., 335 Mo. 845, 74 S. W. (2d) 348, 353. And see State ex inf. McKittrick v. Wiley, 349 Mo. 239, 160 S. W. (2d) 677, 683. Proof of willfulness was required. Coleman v. Kansas City, 351 Mo. 254, 173 S. W. (2d) 572, 577; State ex inf. McKittrick v. Murphy, 347 Mo. 484, 148 S. W. (2d) 527, 530; State ex inf. McKittrick v. Wilson, 350 Mo. 486, 166 S. W. (2d) 499, 501; Bakersfield News v. Ozark County, 338 Mo. 519, 92 S. W. (2d) 603, 605. Relator assumed the burden of proof and now insists that the burden has been discharged by the state. Relator says: "That the intention of respondent to 'farm out' the performance of the duties of his office to another 'for the * * * profit of the officer' was *premeditated* is shown by the fact that he entered into the contract of employment with Skelly on March 14, 1949; that his intention and conduct was *willful* is demonstrated by the fact that he employed McNay and put him to work in the offices of county treasurer and ex officio collector in March, 1949, at the expense of respondent * * . * that on or before May 7, 1949, respondent, insofar as his official duties and obligations were concerned, *abandoned* his offices as county treasurer and ex officio collector of Bates County, Missouri and the same then stood forfeited, * * * ." (Italics ours)..

Relator points out that, under the statutes, "respondent was required to attend on his offices during the usual business hours and to devote his personal attention to the performance of his duties." Relator insists that the word, "personally," as used in Sec. 106.220, supra, means "done in person, without the intervention of another"; and that "devote" means to wholly or chiefly direct the attention to the discharge of the duties of the office. Relator also insists that the claimed efficiency of the respondent's alleged deputy is no defense to the action, since there is no statutory provision for a deputy in the office in question; and that, because of the peculiar public trust involved, the duties of the office cannot be delegated to an agent. This position is slightly relaxed in relator's reply brief, as follows: "No sensible person would contend the County Treasurer should spend each hour of the business day in his office, nor that he should not take an occasional day off with someone in charge of the office to look after strictly routine matters, nor that he could not have

clerical help to assist him in transcribing his records under his supervision.''

In his brief relator cites and discusses more than sixty statutory provisions related in some manner to respondent's office. The "voluminous" and "manifold" duties and responsibilities of respondent as treasurer and ex officio collector of Bates County are particularly emphasized, but the record and the brief do not suggest any failure on respondent's part to see that every duty has been faithfully discharged, except as to personal attendance at the office "during the usual business hours" and except as to personally devoting his entire time "to the performance of the duties of such office." That respondent's office has been efficiently and capably operated is in effect conceded, but relator says that "Regardless of how efficiently the offices of county treasurer and ex officio collector of Bates County * * * were run, so long as that was not accomplished by respondent attending his office during usual business hours and personally devoting his time to the performance of the duties of his offices, it is immaterial.''

In this connection relator considers respondent's handwritten daily reports to the Skelly Oil Company to be "evidence of the highest probative value" and as conclusive evidence "that respondent failed to attend the office of treasurer and ex officio collector during the usual business hours and failed to personally devote his time to the discharge of his official duties." Relator relies upon these exhibits to the exclusion of the otherwise undisputed oral testimony of witnesses called by both relator and respondent. While the exhibits were in the nature of admissions against interest, the evidence was not conclusive, nor necessarily in conflict with the oral testimony. In any event the evidence was subject to explanation, and explanation was offered. The special commissioner saw and heard the witnesses of the respective parties and accepted the oral testimony as true. We defer to his findings on the fact issues presented. In re Parkinson, 344 Mo. 715, 128 S. W. (2d) 1023, 1037, 1039.

Relator relies particularly upon State ex rel. Tilley v. Slover, supra, and State v. Yager, 250 Mo. 388, 403, 157 S. W. 557. We think these cases are clearly distinguishable upon their facts from the present case. Willfulness and intentional dereliction of duty was conclusively shown in each of the cases relied upon. In each case the officer left his office in charge of a deputy or deputies without any personal supervision, management or control on his part, although in one case he left it for only a short time. In each case this court only reviewed the record after the officer had been ousted from his office. Each was an aggravated case. Such is not the case here. The cases are not decisive.

Relator's position is further evidenced as follows: "An office is not property in the ordinary sense. The conditions upon which a

statutory office may be retained can be prescribed by the Legislature.'' State ex inf. Barrett ex rel. Bradshaw v. Hedrick, 294 Mo. 21, 241 S. W. 402, 422. If the conditions imposed ''are too stringent, or too disagreeable, the option to refuse the office or to resign it remains.'' Duffy v. Cooke, 239 Pa. 427, 86 Atl. 1076, 1078. The honors and emoluments of an office cannot be accepted by one person and the performance of its duties farmed out to another for convenience or profit. State ex rel. Tilley v. Slover, supra; State ex rel. McGaughey v. Grayston, 349 Mo. 700, 163 S. W. (2d) 335, 341. No man can serve ▮ two masters. The acceptance of a public office implies the obligation to subordinate private interests to public duties. City of Minneapolis v. Canterbury, 122 Minn. 301, 142 N. W. 812, 814. It is the duty of public officers to refrain from outside activities which interfere with the proper discharge of their duties. 43 Am. Jur. 81, Public Officers, Sec. 265. Relator contends that respondent was required to ''attend'' his office during the usual business hours and to ''personally'' devote his time to the performance of the duties of his office, ''unless by other pressing official duties, or by illness, or some other lawful reason he was prevented therefrom''; and that it is no excuse that during his absence his assistants in his absence may have performed as well, or better than he, the duties incumbent upon him by law. State v. Yager, supra; State ex inf. McKittrick v. Wilson, supra.

Relator insists that a finding that respondent has forfeited his office should be made, and that an order of ouster be entered. We do not think the words of Sec. 54.100, that ''the county treasurer shall keep his office at the county seat of the county for which he was elected, and shall attend the same during the usual business hours,'' and the words of Sec. 106.220 ''who shall fail personally to devote his time to the performance of the duties of such office'' should be construed to require the actual continuous physical presence of the respondent in his office during the usual business hours or to require respondent to devote his *entire time* personally during such hours to the actual physical performance of the duties of the office on peril of forfeiture of his office. The sections have not been so construed and we think they should not be so construed. The authorities, however, are very limited.

In the case of Fairly v. Western Union Telegraph Co., 73 Miss. 6, 18 So. 796, 797 it was held that a constitutional provision that no person shall hold an office of profit ''without personally devoting his time to the performance of the duties thereof'' must be given a reasonable construction. The court said: ''If the public duties of an office require all the time of a public servant, then the whole time must be given. If all the time of the officer be not required for the complete and faithful execution of his trust, then he shall give such time and devote such service as shall suffice for the full and faithful

discharge of the duties of his office." In commenting upon the above case the court, in Miller v. Walley, 122 Miss. 521, 84 So. 466, 467, said: " * * * the decision does not hold that the entire time of the superintendent was to be devoted to the public office, but holds that only such time as the duties of the office required for a proper performance must be devoted to the duties of the office. This neces- sarily presents a latitude for differences and debate as to what time is required as a matter of fact." In the case of State v. Hinshaw, 197 Iowa 1265, 198 N. W. 634, 637, in an action to require the State Fish and Game warden to account for certain funds, the court said: "There is no contention here that appellee neglected any of his offi- cial duties whatever, nor is there any claim that he misappropriated any of the property of the state. A public officer is not required to give every instant of his time to the public service in such a sense that he cannot, if wholly consistent with public duties, perform any other service or earn money from any other source. His first and para- mount duty is to perform all of the requirements of his office, but he is not barred because he holds public office from investing his funds in a legitimate business enterprise, nor prohibited from re- ceiving profits from an independent business in which he may have an interest."

In State ex inf. McKittrick v. Murphy, supra, 148 S. W. (2d) 527, 530, this court said: "The officer who violates his oath of office by corruption, willful misconduct or neglect of official duty auto- matically loses the right to office and becomes a mere interloper. * * * the judgment in quo warranto does not try the question of forfeiture. It merely recognizes judicially fait accompli and ousts the wrongdoer from enjoying the privileges * * * which he has ceased to possess." The record in this case does show that respondent ▆▆▆▆ devoted a great amount of his time and energy to private matters directly connected with his oil company employment. Wheth- er he substantially subordinated his public duties to his private inter- ests and outside activities has been a close and difficult question. A public officer owes an undivided loyalty to the public whom he serves and he should not place himself in a position which will sub- ject him to conflicting duties or expose him to the temptation of acting other than in the best interests of the public. 43 Am. Jur. 81, Public Officers, Sec. 266. However, we think the evidence in this record sufficiently shows that respondent at all times exercised super- vision, management and control of his office; that he supervised and directed the activities of his assistants who did the manual physical work, accounting and bookkeeping necessary to the office; and that respondent assumed and discharged the responsibilities of the office. Under all of the facts and circumstances shown, we should not hold that respondent forfeited his office by any failure to physically attend his office during all of the usual business hours or to personally

devote his entire time to the performance of the duties of his office, when such was not required for the faithful performance of his duties. The evidence fails to show any willful failure or neglect to personally attend to or perform the duties of his office.

The removal of a public officer from office is indeed a drastic remedy and, in such circumstances, statutory provisions for forfeiture should be strictly construed. 43 Am. Jur. 39, Public Officers, Sec. 194. Forfeitures are not favored. Further, this court may properly exercise a sound judicial discretion in granting or refusing a judgment of ouster in a quo warranto proceeding. State ex inf. McKittrick ex rel. City of Campbell v. Arkansas-Missouri Power Co., 339 Mo. 15, 93 S. W. (2d) 887, 893, supra. The court will not grant it unless some good purpose can be served by it or unless it is in the public interest. State ex rel. Worsham v. Ellis, 329 Mo. 124, 44 S. W. (2d) 129, 131.

On the record in this case a declaration of forfeiture is denied and an order of ouster refused. The proceeding should be dismissed. It is so ordered. All concur.