EDWARD J. WARD, PLAINTIFF-RESPONDENT, v. JOHN B. KEENAN, DIRECTOR OF PUBLIC SAFETY OF THE CITY OF NEWARK; FRANK A. O'NEIL, CHIEF OF POLICE OF THE CITY OF NEWARK; RALPH A. VILLANI, STEPHEN J. MORAN, LEO P. CARLIN, MEYER C. ELLENSTEIN AND JOHN B. KEENAN, COMPRISING THE BOARD OF COMMISSIONERS OF THE CITY OF NEWARK, A MUNICIPAL CORPORATION, DEFENDANTS-APPELLANTS.

Argued October 10, 1949—Decided December 5, 1949.

*Mr. Charles Handler* argued the cause for the appellants (*Mr. George B. Astley* on the brief).

*Mr. Gerald T. Foley* argued the cause for the respondent.

The opinion of the court was delivered by

VANDERBILT, C. J. The plaintiff, a police officer of the City of Newark since 1924, applied for and was granted a leave of absence without pay for a period from February 1, 1949, to May 31, 1949, to enable him to become a candidate in the city commission election in Newark on May 10th. In the course of the campaign and while on leave of absence he distributed literature and made several speeches and radio addresses in a number of which he asserted both generally and specifically that there was corruption, graft and misconduct in the police department of the City of Newark and charged his superiors with knowledge of and participation therein. In the middle of the campaign and while the plaintiff was still on leave, the Chief of Police called him in and requested him to furnish details with respect to the charges he had been making, but the plaintiff refused to answer any questions. His leave of absence was not revoked, however, and he was permitted to continue with his campaigning.

On June 1st, the first day of his return to active duty, the plaintiff was served with departmental charges preferred by the Chief of Police and was suspended from duty without pay pending the hearing of these charges. The charges, all of which are founded upon the violation of departmental rules and regulations, are six in number: (1) willful disobedience of orders and failure to report crime to his commanding officer, based upon his refusal to answer the questions put to him by his chief; (2) neglect of duty and failure to report the commission of crime, based upon a radio address made on April 4th wherein he professed to know the names of certain violators of the law; (3) failure to take proper police action and to divulge information to his superior officers, based upon a broadcast made on April 11th to the effect that narcotic peddlers were operating in Newark; (4) failure

to take proper police action and to divulge information to his superior officers, based upon a statement made in the same broadcast in which he publicly named a number of alleged gamblers still at large; (5) conduct contrary to good order and discipline in the making of false and inaccurate statements in broadcasts made on April 18th and May 9th concerning the handling by the police department of the case of a person arrested for carrying concealed weapons; and (6) public disparagement and unfavorable comment on the official actions of the Director of Public Safety, whom he charged in the course of a broadcast on May 9th with neglecting his public duties.

Prior to the date set for the hearing of these departmental charges by Director of Public Safety Keenan, the plaintiff commenced the present proceeding in lieu of a prerogative writ and, on June 27, 1949, on his motion a summary judgment was entered in his favor, vacating his suspension, directing his reinstatement and ordering that the charges against him be expunged, that the defendant Director of Public Safety be permanently enjoined from conducting any hearings on these charges, and that the Board of Commissioners reimburse him for the loss of his salary between the date of his suspension and his reinstatement. From this judgment the defendants took an appeal to the Appellate Division of the Superior Court. That appeal has now been brought here on our own certification.

The defendants contend that the plaintiff must exhaust his administrative remedies, consisting in this case, first, of a hearing before the defendant Director of Public Safety, and then a review by way of a hearing *de novo* before the Civil Service Commission, *R. S.* 11:22–38 and 39, before the plaintiff may resort to a proceeding in lieu of a prerogative writ. The plaintiff claims that the charges against him are insufficient as a matter of law for the reason that while he was on leave of absence he was not subject to the rules and regulations of the Police Department and so he could not have been guilty of violating any of them. These two questions will be considered separately.

## I.

The doctrine that a litigant must exhaust his administrative remedies before he may resort to the courts dates back to the advent of the Interstate Commerce Commission in 1887, Berger, *Exhaustion of Administrative Remedies,* 48 *Yale L. J.* 980 (1939), and the inception of the modern phase of administrative law marked by the creation of commissions with commingled legislative, executive and judicial powers as distinguished from the traditional body of administrative law by which officials and bodies in the executive branch of government both at the local and higher levels were kept within their respective spheres and were held to the methods prescribed by law by a series of remedies in the courts ranging from the prerogative writs and bills in equity for injunction to suits at law for damages. Intended as a simple rule of orderly procedure designed to provide uniformly that administrative bodies might perform their statutory functions without preliminary litigation in the courts, *United States v. Sing Tuck,* 194 *U. S.* 161, 24 *Sup. Ct.* 621, 48 *L. Ed.* 917 (1904) ; 1 *Vom Baur, Federal Administrative Law,* 207-229 (1942), the rule insisting on the exhaustion of administrative remedies has been highly provocative of litigation that shows no sign of abating from year to year or of producing the intended simplicity and uniformity; *cf., e. g.,* 1943 *Annual Survey of American Law,* 107; 1944 *Id.* 188-189; 1945 *Id.* 201-205; 1946 *Id.* 217-224; 1947 *Id.* 237-238; 1948 *Id.* 160-163, for current instances of the waywardness of Federal decisions under the rule. Without attempting to comment on all the cases, we will content ourselves with referring to *Myers v. Bethlehem Shipbuilding Corporation,* 303 *U. S.* 41, 58 *Sup. Ct.* 459, 82 *L. Ed.* 638 (1938), holding that the doctrine of exhausting administrative remedies applies even to cases where the administrative agency has to pass on the question of its own jurisdiction. This holding has been recently reaffirmed in *Securities and Exchange Commission v. Otis & Co.,* 70 *S. Ct.* 89, where the United States Supreme Court reversed without opinion a decision of the United

States Court of Appeals for the District of Columbia to the contrary, 176 *F.* 2d 34 (1949). Where the question of jurisdiction depends, as it often does, on questions of fact, and where the Federal courts apply their version of the "substantial evidence" rule, which often signifies something falling far short of the weight of the evidence, the ultimate benefits of judicial review of the question of jurisdiction may be little more than *pro forma, Cf. National Labor Relations Board v. Hearst Publications,* 322 *U. S.* 111, 64 *Sup. Ct.* 851, 88 *L. Ed.* 1170 (1940). This point of view is at variance with the Rule of Law as enforced in this State, *Cf. Mulhearn v. Federal Shipbuilding & Dry Dock Co.,* 2 *N. J.* 356, 364 (1949).

Enough has been said to raise grave doubts as to the wisdom of adopting the rule of exhaustion of administrative remedies as contended for by the defendants. To determine what rule of law should be adopted in the case before us, we must consider what was intended to be accomplished by Article VI, Section V, paragraph 4, of our Constitution:

"4. Prerogative writs are superseded and, in lieu thereof, review, hearing and relief shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court, as of right, except in criminal causes where such review shall be discretionary."

The prerogative writs were superseded in the 1947 Constitution because certain phases of their procedure had been the cause of widespread dissatisfaction. First, there was always the danger of discovering in an appellate court that one had sued out the wrong prerogative writ, rendering it necessary to start over again, if indeed one had not lost his cause of action by laches or through an intervening change of position. Thus, for example, one might have applied for and been granted *certiorari* only to discover after argument and determination that he should have proceeded by way of *quo warranto* or *mandamus,* or *vice versa;* see, *e. g., Ford v. Gilbert,* 89 *N. J. L.* 482 (*Sup. Ct.* 1916); *Overman v. Manly Drive Co.,* 77 *N. J. L.* 290 (*Sup. Ct.* 1909); see, also,

*Sisters of Charity of Saint Elizabeth v. Morris Railroad Co.,* 84 *N. J. L.* 310, 313 (*E. & A.* 1913). Similar awkward situations had long been known in ordinary suits at law with respect to the choice of an appropriate form of action until a single form of civil proceeding known as an action at law was created by the Practice Act (1912), *R. S.* 2:27–7. By analogy thereto, all difficulties with respect to a choice of the proper prerogative writ have been resolved by providing for a single proceeding in lieu of all prerogative writs, *Rule* 3:81. Again, applications for a prerogative writ were often denied without any expression of the reasons therefor and such a practice was deemed inconsistent with the general policy of the law in favor of the public statement of the reasons for judicial determinations. It was thought, too, that the right to sue out a prerogative writ should not be dependent on obtaining the *allocatur* of a court or of a justice thereof. It was believed that the allowance of a prerogative writ should not be a matter of judicial discretion any more than the filing of a bill in equity or the issuance of a subpoena to answer it. Accordingly, the new Constitution directed the Supreme Court to provide by rules for review, hearing and relief in proceedings in lieu of prerogative writs. This direction of the Constitution the Supreme Court has carried out by the promulgation of *Rule* 3:81.

Another complaint directed against the old prerogative writs was the delay on bringing them to a conclusion. Fifty-three years ago a writer in the New Jersey Law Journal commented: "The function of the writ [*certiorari*] will be greatly enhanced when a more speedy determination follows its allowance, and it ceases to arrest unto death the enterprises and projected improvements of our citizens." 19 *N. J. L. J.* 133 (1896). The taking of depositions on proceedings by prerogative writs, like ordinary references, had all too often proceeded at a leisurely pace without regard to the public importance of the issues, and arguments before the former Supreme Court could only be heard at its terms in February, May and October. The delays on appeal were even greater: by reason of the fact that only ten days ensued between each

term of the Supreme Court and the next ensuing term of the Court of Errors and Appeals, there was always a lapse of at least one term and generally more than one term before any appeal could ultimately be heard in the court of last resort. To be considered in dealing with the constitutional provisions for proceedings in lieu of prerogative writs is the policy of the new Constitution against delay and delaying tactics in all litigation; *Cf*. Const., Article VI, Section II, paragraph 3, conferring on the Supreme Court the power to "make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts," and Article VI, Section VII, paragraphs 1 and 2, designating the Chief Justice of the Supreme Court as "the administrative head of all of the courts in the State" and giving him the power to "assign judges of the Superior Court to the Divisions and Parts of the Superior Court" and "from time to time to transfer judges from one assignment to another as need appears." The importance of dispatch in this particular class of cases is recognized in the rule above referred to, especially in *Rule* 3 :81–6 advancing such proceedings "for hearing, trial and disposition by the court," and in *Rule* 3 :81–4, providing for motions for summary judgment on proceedings in lieu of prerogative writs brought to enforce a ministerial act or duty. These cases are required to be decided promptly as befits the transaction of important public business. The taking of testimony in open court or, more commonly, hearings on stipulated facts have replaced the taking of depositions, a practice that may achieve as great a change in this field as was accomplished almost a century ago by the rule permitting the taking of testimony in Chancery orally rather than by depositions, *Rule* 175 of the Rules of the Court of Chancery (1871). Finally, each of the old prerogative writs retained a formality in its pleading and technicalities in its procedure that contrasted to their disadvantage with the simplicity of actions at law under the Practice Act (1912) and the Chancery Act (1915).

Despite these objections to the former practice on prerogative writs, the fact remains that *certiorari,* the most widely

used of the prerogative writs, as it developed in New Jersey, presents an outstanding example of the capacity of the common law to develop to meet new needs. The New Jersey courts "have taken in almost every respect a more liberal view of the province of the writ [of *certiorari*] than the courts of other commonwealths— \* \* \*" Goodnow, *The Writ of Certiorari*, 6 *Pol. Sci. Q.* 493-532 (1891). At common law the writ of *certiorari* was one of limited utility, serving merely to bring up a record of an inferior court or of certain of its officers such as sheriffs or coroners, 1 *Holdsworth, History of English Law* 228 (1922). Evidence outside the record was never admissible, *King v. Inhabitants of Woolton-Rivers*, 5 *Mod.* 150, 87 *Eng. Rep.* 576 (1794); *Inter the Inhabitants of Weston-Rivers*, 2 *Salk.* 493, 91 *Eng. Rep.* 423 (1795); *Pike v. Herriman*, 39 *Me.* 52, 53 (1854); see *Drainage Commissioners v. Griffin*, 134 *Ill.* 330, 340, 25 *N. E.* 995, 996-997 (1890); *Commonwealth v. Blue-Hill Turnpike Corp.*, 5 *Mass.* 420 (1809); *People v. Commissioners of Highways*, 30 *N. Y.* 72, 76 (1864). By the simple but far-reaching device of permitting the taking by depositions of evidence dehors the record, the Supreme Court of the Colony of New Jersey made the writ of *certiorari* a more generally useful instrument for correcting the mistakes of the all too often unlettered justices of the peace than it could possibly have been had it been obliged to confine itself solely to the formal record brought up by the writ, 4 *Encyc. of Pleading & Practice* 261n, 277 (*McKinney, Ed.* 1896). This ingenious procedural device also paved the way for enlarging the scope of *certiorari* far beyond the mere review of the judicial action of inferior courts so as to reach official misconduct in many fields. The origin of the practice of taking depositions is lost in the incomplete archives of our early judicial history, but we have been able to trace it back as far as the case of *Collins v. Webb* in 1733, *Supreme Court Docket*, 1731-1737, p. 77, where we find the following entry:

"Upon a *Certiorari* from the County Court Upon reading severall Affidavits & hearing the Counsell on both Sides It is Ordered by the Court that a *procedendo* be awarded to the Court below."

This practice had reached full growth by 1794 in *State v. Justices, etc., of Middlesex,* 1 *N. J. L.* [\*244] 283, 284 (*Sup. Ct.* 1794), where the writ was used to inquire into the validity of an election and the court relied on the facts developed in the depositions in reaching its decision, and is reflected in the first available rules of the Supreme Court, 1 *N. J. L.* xii-xiii (1805).

The policy of enlarging the record by extrinsic evidence made it possible to extend the scope of the writ beyond the review of the judicial action of inferior courts to include *quasi*-judicial, *quasi*-legislative, and administrative action of all kinds (even including cases where there was an abuse of administrative discretion) to do justice between the private citizen and a public official or body in many types of cases where it could not have been attained under the common law rule to the contrary. The variety of uses to which *certiorari* was put in civil matters (its use in criminal causes is dealt with separately in the new Constitution and is not treated here) was summarized by Chief Justice Green in *Treasurer of Camden v. Mulford,* 26 *N. J. L.* 49, 54 (*Sup. Ct.* 1856) :

"* * * in this state the remedy [*certiorari*] has been extended to wrongs inflicted upon individuals, whether by judicial decision, by corporate acts, or by the acts of special jurisdictions created by statute.

"Thus, it is habitually used as a remedy against unlawful taxation, either for state, county, township, or city purposes; and while the remedy has been denied in other states, as dangerous or prejudicial to the public welfare, no such evil has been experienced from the use of the remedy, while it has been found eminently salutary and efficacious as a protection to private rights against oppressive and illegal taxation.

"It is used to test the legality of an election, *State v. Justices of Middlesex, Coxe* 244; *State v. Anderson, Coxe* 318; to test the validity of a by-law of a municipal corporation, *State v. Corporation of New Brunswick, Coxe* 393; to test the validity of the classing and assessing of the militia under the militia act of 1794, *State v. Chambers, Coxe* 400; to review the return list of delinquents, and executions issued for the collection of fines imposed for neglect of militia duty, *State v. Kirby,* 1 *Halst.* 143; *State v. Atkinson,* 4 *Halst.* 271; the laying out of a road under an act incorporating a turnpike company, *State v. Newark and Pompton Turnpike Co.,* 1 *Penn.* 338; the appointment and proceedings of commissioners appointed to value lands taken by corporations for their use, and to appraise damages by special statutory authority, *The State v. The*

*Morris Canal,* 7 *Halst.* 565, 2 *Green* 411; *Bennet v. Railroad Co.,* 2 *Green* 151; *Van Winkle v. Railroad Co.,* 2 *Green* 164; *Smith v. The Trenton Delaware Falls Co.,* 2 *Harr.* 5."

The especial significance of the broad scope of *certiorari* in New Jersey in protecting an aggrieved citizen from almost every form of improper official action is epitomized by Holdsworth in speaking of the prerogative writs generally:

"This judicial control could be applied at the suit of the private citizen. The private citizen could set in motion the different forms of procedure open to the Crown, and, in addition, he could bring a civil action. This power to bring a civil action was an effective control, a safeguard of the liberty of the subject, and one of the best of all the securities for the maintenance of the supremacy of the law." (10 *History of English Law*, 157.)

Our problem is, therefore, by rules of court and judicial decisions, to preserve as far as may be the substantive law of the former prerogative writs as a means of safeguarding individual rights against public officials and governmental bodies, while at the same time avoiding the defects of procedure that led to criticism. Among our new Rules is 3 :81–14:

"Except where it is manifest that the interests of justice require otherwise, proceedings under *Rule* 3:81 shall not be maintainable, so long as there is available judicial review to a county court or inferior tribunal or administrative review to an administrative agency · or tribunal, which has not been exhausted."

When do the interests of justice require the use of a proceeding in lieu of a prerogative writ before exhausting the remedies specified in *Rule* 3:81–14? Under the former practice there were two generally recognized exceptions to the rule: first, when the jurisdiction of the statutory tribunal was questioned on persuasive grounds a writ of *certiorari* might be allowed the challenging party in advance of the hearing before the statutory tribunal for the obvious reason that if the question of jurisdiction were resolved against the statutory tribunal the parties would be spared the vexation of a useless hearing; second, when the statutory tribunal had jurisdiction but the charges asserted before it were so palpably defective that its jurisdiction was merely colorable, a writ might like-

wise be allowed in advance of the hearing before a statutory tribunal, *Mowery v. Camden,* 49 *N. J. L.* 106, 109-110 (*Sup. Ct.* 1886). In determining what course to pursue under the new practice in this field we should look to the decisions on the old procedure on prerogative writs, not as controlling authorities but for what light they may throw on the instant problem of presenting sound rules of procedure. Much light may also be gained from examining the practice in analogous cases of equitable procedure, for it is becoming increasingly clear, now that discretion in granting of the writ has been abolished, that the procedural principles applicable in the two fields are in many respects identical. Upon such a review of the pertinent cases we are of the opinion that the two exceptions discussed in the *Mowery case* are sound and much to be preferred to the Federal rule of exhaustion of administrative remedies discussed *supra* and they should, all other things being equal in any particular situation, be treated as exceptions to *Rule* 3:81-14.

An examination of the charges made in the pending case against the plaintiff by the defendant Chief of Police does not convince us that they are so palpably defective as to make his jurisdiction merely colorable, but on the contrary, for the reasons which we will set forth under Point II, we think the charges are substantial and well founded in law, with the result that *Rule* 3:81-14 should be applied.

## II.

 The contention of the plaintiff is that he is not subject to departmental rules and regulations of the Police Department during the period of his leave of absence as to the misconduct with which he is here charged.\ The plaintiff seems to have conceived the notion that his leave of abence, quixotically granted him by the Director of Public Safety in violation of Rule 18 of the Department, whereby "Members of the Department are positively prohibited from active participation in politics other than to exercise their right of suffrage," to permit him to run for the City Commission,

terminated absolutely any responsibility of his as a policeman during the period of his leave·of absence while he was submitting himself to the temptations to the use of apparently extravagant language that all too often accompanies political campaigning. In support thereof, he cites several cases which variously define the legal status of the individual and the office from which he has been granted a leave of absence, *e. g., Kobylarz v. Mercer,* 130 *N. J. L.* 44, 52 (*E. & A.* 1943); *McCoy v. Board of Supervisors,* 18 *Cal.* 2d 193, 114 *P.* 2d 569 (1941); *Whitehead v. Davie,* 189 *Cal.* 715, 209 *P.* 1008 (1922); *School City of East Chicago v. Sigler,* 219 *Ind.* 9, 36 *N. E.* 2d 760 (1941); *State v. Grayston,* 349 *Mo.* 700, 163 *S. W.* 2d 335 (1942). Whatever may be the status of other public officers and employees, a police officer who is granted a leave of absence is not thereby divested of all· of his rights nor relieved of all of his obligations as a police officer. Neither the police officer nor the Department contemplates a complete divestiture of his status as a police officer. Thus, we conceive that a police officer on leave of absence does not lose his tenure during good behavior, *R. S.* 40:47–5, is not deprived of his protection against removal, reduction, suspension, or fine, except for just cause on written complaint and after hearing, *R. S.* 40:47–6, and does not forfeit his pension rights; see *Carroll v. City of Bayonne,* 3 *N. J. Misc.* 308 (*Sup. Ct.* 1925). Similarly with respect to his duties and obligations, he may not accept the benefits entirely discharged from the burdens of his employment. Hence, it is our view that a police officer while on leave of absence is subject to all of the rules and regulations of his department which are reasonably applicable in the light of the nature and purpose for which the leave is granted, *Cf. Windhorst v. Jersey City,* 127 *A.* 586 (*Sup. Ct.* 1921), not officially reported. Thus, a policeman who is given a leave of absence to visit relatives in a distant place is in quite a different position from the policeman who is given leave of absence that does not take him out of the city.

To insist, for example, as the plaintiff does, that, in the circumstances here present, the plaintiff, being in Newark,

could have with impunity refused to obey an order to return to duty temporarily in an emergency that occurred during the period of his leave of absence is to ignore the role in our government of a police officer. For the same reason he was not privileged during his self-styled hiatus to fail to report the commission of any crimes of which he had knowledge or to refuse to divulge such information when so requested by his superior officers. To hold otherwise would permit of conduct adverse to the discipline and morale of a police department that is so vital to the efficient discharge of its duties in the protection of the public:

"* * * The police department of our cities * * * is built upon a plane of public efficiency, which has ordinary truth and morality as its base, and when these essential elements of public probity be lost, the department shall have lost, not only the confidence of the community, but the fundamental mainstay and support which is necessary to its effective and satisfactory operation." [*Martin v. Smith*, 100 *N. J. L.* 50, 52 (*Sup. Ct.* 1924).]

So far as concerns the obligation of a police officer to observe applicable departmental rules and regulations, it is our conviction that a leave of absence, instead of constituting a complete severance of responsibility, is analogous to the off duty period enjoyed daily by every police officer, except that it extends for a longer period, subjecting him to liability for his misconduct or for his breach of rules and regulations in accord with the philosophy expressed in *Herbert v. Atlantic City*, 87 *N. J. L.* 98, 101 (*Sup. Ct.* 1915):

"It is argued for the prosecutor that because he was not on duty at the time as a police officer when the episode related occurred, therefore, the quoted section of the statute is not applicable to him. In other words, the contention practically is that a police officer when off duty may misbehave and misconduct himself as much as he pleases, namely, he may be engaged openly in conduct tending to reflect upon the morale and discipline of the police force and department, without being held to account for such misbehavior or misconduct. If this were so, then the discipline and morale of the police force, which the legislature evidently intended to secure by the provision of the statute referred to, is seriously threatened, and its efficacious object of requiring good behavior and denouncing misconduct of a police officer will be signally defeated."

This view was expressly adopted by unanimous vote of the Court of Errors and Appeals in *Hailes v. Town of Kearny,* 101 *N. J. L.* 401 (*E. & A.* 1925).

conclude, therefore, that the plaintiff during his leave of absence was subject to the departmental rules and regulations that he is charged with having breached, that the charges made against him are not for this reason insufficient as a matter of law, and that the relief granted by the court below is erroneous. Accordingly, the judgment of the Law Division of the Superior Court is reversed.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, BURLING and ACKERSON—6.

*For affirmance*—None.