80 N.J. Super. 570 (1963)
194 A.2d 378
HIGHPOINT, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
BLOOMFIELD PLANNING BOARD, BLOOMFIELD, NEW JERSEY, MAYOR AND COUNCIL, TOWN OF BLOOMFIELD, NEW JERSEY, A MUNICIPAL CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 11, 1963.
*573 Mr. David A. Rappeport for plaintiff.
Mr. Joseph D. Lintott for defendants.
GIULIANO, J.S.C.
Plaintiff filed a complaint in lieu of prerogative writ for review of certain action taken by the town council (council) and planning board (board) of the Town of Bloomfield. Plaintiff is the assignee of the Troy Development Corp. (Troy) which filed an application seeking to obtain approval of a proposed subdivision of land located in Bloomfield. The land in question is known as Lot 35 and parts of Lots 31, 33 and 35 on Map 39 Block 1082.
The board rejected the first plat submitted by Troy on January 9, 1962. A second application was made to the board on February 7, 1962. This plat, as submitted, provided for a division of the tract into 13 lots and a dead-end street, Jay Drive. A turn-around of 50 feet, with a radius at the center of Jay Drive, was proposed. On October 9, 1962 the board refused to approve the plat as submitted but classified the subdivision as major and indicated that the plan would be approved if the turn-around was made tangent to the right side of Jay Drive and was partially within Lots Nos. 100 and 101 of the proposed subdivision. The board further provided that when Jay Drive was made a through street, the portion of Lots 100 and 101 taken by the turn-around would revert to the owners of the respective lots. Pursuant to the procedure prescribed by statute and the ordinance, Troy appealed this action of the board to the council and at the same time petitioned the board to reconsider its action of October 9, 1962.
Acting under what it termed a remand by the council for clarification of its October 9, 1962 action, the board on November *574 20, 1962 considered an alternative proposal submitted by the developer. The alternative plan, as submitted, provided for a temporary turn-around to be laid on a radius of 25 feet at the end of Jay Drive, to be located wholely within the right of way of the proposed street. The new proposal was classified as a major subdivision and the board voted tentative approval. No further action was taken by the developer.
The council, composed of several new members as a result of the November election, held a meeting on January 12, 1963 at which it declined to authorize execution of the development agreement with the developer and remanded the matter to the board for further consideration. The board, also having several new members, met on February 12, 1963. At this meeting the chairman inquired as to whether there was a motion to "re-affirm" the action of the board taken on November 20, 1962. No motion was made. Thereafter, a motion was made and carried to "re-affirm" the action of the board taken at the October 9, 1962 meeting.
Plaintiff now urges that the action of the board on November 20, 1962 be declared effective and controlling, and that the subsequent action of the council on January 12, 1963, and the board on February 12, 1963, be declared void.
The decision here primarily rests upon an interpretation of the Municipal Planning Act of 1953, N.J.S.A. 40:55-1 et seq., from which municipalities derive the authority to create planning boards. The rules which the courts are to follow in deciding such questions of interpretation are clearly set out in Levin v. Livingston Twp., 35 N.J. 500 (1961) and are as follows:
"* * * Questions of interpretation and construction must therefore be resolved in favor of governmental authority, when reasonably possible to do so, for the maximum protection of the primary public interest, as well as incidentally for the benefit of the individuals who become the ultimate owners of the subdivider's final product. This does not mean that the legitimate interests of the developer are to be completely forgotten. He is entitled to substantive and procedural fairness, having in mind the primacy of the public interest and the *575 principal objects of regulation. And, since the statute spells out in considerable detail the scope, manner and procedure of permissible local regulation, the implementary provisions of the ordinance must be confined within the framework and reasonable intendment thereof. The municipality may not, on the one hand, go beyond the fair limitations of the act nor may it, on the other, validly impose lesser or contrary requirements than are minimally called for." (35 N.J., at p. 507)
With this rule of interpretation as a guide the statutory authority in question will be set out. Municipalities of New Jersey were authorized under the Municipal Planning Act of 1953 to adopt a planning board which would oversee the orderly development of the municipality through regulation of land subdivision. Power to adopt this method of control is not mandatory but permissive, and exercisable by municipal ordinance. N.J.S.A. 40:55-1.3; Kotlarich v. Mayor and Council of Borough of Ramsey, 51 N.J. Super. 520 (App. Div. 1958). Control of land subdivision is secured by requiring municipal approval of subdivisions the municipality may consider in need of regulation. Municipal approval may be provided in one of two ways, N.J.S.A. 40:55-1.14. One method is to authorize the board as a referral agency whose function is to refer meritorious plans to the governing body for the required approval. The second method is to give the board authority to act in lieu of the governing body in granting or not granting approval of proposed subdivisions. The former type of board is known as a "weak" board and the latter as a "strong" board. Cunningham, "Control of Land Use in New Jersey under the 1953 Planning Statutes," 15 Rutgers L. Rev. 1 (1960).
The Town of Bloomfield, by ordinance, adopted the strong board, giving it full authority to pass on the merits of proposed subdivisions, as follows:
"The planning board may tentatively approve a plat showing new streets or roads, or the resubdivision of lands along a mapped street, in which case the chairman of the Planning Board shall affix his signature to the plat with a notation that it has received tentative approval * * *." (Bloomfield, N.J., Municipal Ordinance § 5(2) (e))
*576 There are three basic steps in subdivision control. The first involves determining whether the subdivision in question is major or minor, the second (if the division is major) the securing of tentative approval, and the third securing final approval.
The instant matter will be considered in light of these statutes. The first action of any import taken by the board occurred on October 9, 1962. At that meeting the board, acting pursuant to the authority given it by ordinance and in lieu of the governing body, rejected the first plan submitted by the developer for a turn-around with a radius of 50 feet centered at the middle of Jay Drive. While rejecting that plan, the board stated that tentative approval would be given to the plat with a 50-foot turn around, tangent to the right side of Jay Drive and within Lots 100 and 101. There can be no doubt as to the validity of this action. The board had the authority to take final action with regard to tentative approval, and did so after a full hearing.
Once tentative approval has been received, the general terms and conditions of that approval may only be changed through the authorized avenues of appeal, as set forth in N.J.S.A. 40:55-1.19 and the Bloomfield ordinance, as follows:
"If any person shall be aggreived by the action of the Planning Board, appeal in writing to the governing body may be taken within 10 days after the date of the action of the Planning Board. * * *" Bloomfield, N.J., Municipal Ordinance § 5(4) (g))
The guarantee against change in the general terms and conditions is also set out in both the municipal ordinance, § 5(2) (f), and the Municipal Planning Act (N.J.S.A. 40:55-1.18), in this manner:
"(1) [T]hat the general terms and conditions under which the tentative approval was granted will not be changed. * * *"
The purpose of such a guarantee against change has been clearly expressed in several decisions. Hilton Acres v. Klein, 35 N.J. 570 (1961); Levin v. Livingston, 35 N.J. *577 500 (1961); Pennyton Homes Inc. v. Planning Bd. of Stanhope, 78 N.J. Super. 588 (App. Div. 1963). Such guarantee is designed to be a method of assuring the developer of static circumstances upon which he may rely in estimating the financial feasibility of the proposed project. The scope of the guarantee has been indicated in two recent decisions. In Levin v. Livingston, supra, the court held that the developer, after securing tentative approval by the municipality, had no rights against the subsequent amendment of street pavement specifications. The court found that street specifications were not among the terms which the Legislature intended to protect from change because such specifications would not be of controlling significance for the developer in deciding the economic feasibility of entering into a project. As a further factor, the court found that the public interest in raising the standards of new streets to be laid in the municipality outweighed any resulting inconvenience to the developer.
In a second decision, Hilton Acres v. Klein, supra, the court found that the minimum lot size was within the contemplation of the term "general terms and conditions" and is guaranteed against change for a period of three years. Lot size is therefore considered one of the factors upon which the developer may rely in determining the economic feasibility of engaging in development of an area.
The board, as it was constituted in 1962, was directed by what it termed a remand by the council to reconsider its action of October 9, 1962. This procedure was entirely proper, even in light of the guarantee against change of general terms and conditions, since it was a result of a proper appeal taken by the developer. Thus, on November 20, 1962 tentative approval was given by the board to a new and different plan such as would permit the use of Lots 100 and 101 for building purposes. The obvious effect of the action was to overrule the October 9, 1962 action and make it void leaving the latter action effective and controlling.
The rights with which the developer was vested as of the granting of this tentative approval must be considered. *578 Such rights come about through the statutory guarantee against changes in the general terms and conditions referred to above. Specifically, the subject of such rights is the ability to use Lots 100 and 101 of the proposed subdivision for building purposes. If the number of usable lots is considered a general term and condition, no change should be allowed unless by the appellate procedure outlined above.
The Hilton decision lends its weight to deciding this question. There, lot size was held to be a general term and condition which could not be changed after the granting of tentative approval. The basis of that decision was that a developer should be able to rely on lot size in considering the economic feasibility of developing the area in question. The same conclusion must be reached with respect to the number of usable lots in the subdivision here in question. It must be kept in mind that the purpose of granting rights against change was to give the developer a static plan upon which he may rely in deciding whether the development would be profitable before he engages in expenditures unnecessarily. To be sure, any developer needs to know the number of lots upon which he will be able to build. The loss of only one lot could conceivably reduce an expected profit to such a degree that the development is no longer economically feasible. The fact that at some future date land used in the road bed would revert to the owners, as is argued by the municipality, should not change the result. The developer must consider economic conditions as they exist at the time, not as they may exist at some future date. The protection given the developer was designed to give the developer an opportunity to make a present evaluation, not to force him to consider conditions that may arise 10, 20 or 50 years in the future.
So, then, under the statute Troy should have been able to rely on the terms and conditions from the moment when time for appeal had run, since no appeal was in fact taken. The next action taken with regard to the subdivision did not occur until almost two months after tentative approval was secured, *579 this being the action by the council, and the board's action occurred almost three months after tentative approval was granted.
The court must next be concerned with the nature and effect of the January 12, 1963 action of the council and the February 12, 1963 action of the board. As has been indicated above, the only method by which the general terms and conditions of tentative approval may be changed is through an appeal. No such action was taken after the November 20, 1962 action of the board. In the absence of such an appeal there is no statutory power in the council to act in contravention of the tentative approval granted by the board. The January 12, 1963 action of the council was therefore void. The board was also without authority on February 12, 1963 to reconsider the November 20, 1962 action. The board acted on its own initiative and attempted to nullify the rights granted the developer by virtue of its prior tentative approval. The board at this February 12, 1963 meeting "re-affirmed" its October 9, 1962 action which had been made void by the board's November 20, 1962 action. This resulted in the adoption of an action which was no longer effective. The board could not by a mere "re-affirmance" reinstate the October 9, 1962 action.
There is a further reason for questioning the board's February 12, 1963 action. As has been indicated, the board was composed of several new members. No hearing was held at this February meeting. It is well settled that a board which is composed of members who have not heard the application on the merits may not decide the matter. Before a decision may be rendered, the board, sitting as a body, must hear the matter as though on original application. See Kempner v. Edison Tp., 54 N.J. Super. 408 (App. Div. 1959); Stafford Smith v. Zoning Bd., etc., of Madison, 59 N.J. Super. 553 (App. Div. 1960). Thus, the action of the board in February 1963 must be declared void because of the lack of hearing by the newly composed board.
*580 Therefore, the only action taken by the board which stands as effective and controlling is the action of November 20, 1962. With regard to this, the defendants contend that the November approval is void because it is in contravention of the municipal ordinances with regard to street size. The ordinances in question are as follows:
"Dead-end streets (culs-de-sac) shall not be longer than 600 ft. and shall provide a turn around at the end with a radius of not less than 50 ft. and tangent whenever possible to, the right side of the street.
If a dead-end street is of a temporary nature, provisions made for the future extension of the street and reversion of the excess right of way to the adjoining properties." (Bloomfield, N.J., Municipal Ordinance § 8(2) (m))
"These rules, regulations and standards shall be considered the minimum requirements for the protection of the public health, safety, and welfare of the citizens of the Town of Bloomfield. Any action taken by the Planning Board under the terms of the ordinance shall give prime consideration to the above mentioned matters and to the welfare of the entire community. However, if the subdivider or his agent can clearly demonstrate that, because of peculiar conditions pertaining to his land, the literal enforcement of one or more of these regulations is impracticable or will exact undue hardship, the Planning Board may permit such variance or variances as may be reasonable and within the general purposes and intent of the rules, regulations and standards established by this ordinance." (Ibid., § 11(1))
The above indicates that the tangent of the turn-around should be to the right side of the street, with a radius of 50 feet "wherever possible." The qualifying clause has been interpreted to be an indication of what the controlling principle should be, but also there may be instances in which a finding may be made otherwise. Rogers v. Department of Civil Service, 17 N.J. 533 (1955). In the instant matter the board, in the exercise of its particular expertise, decided within the permissible bounds of its authority what it believed to be in the best interests of the municipality. Such action should not now, almost a year later, be overturned.
Defendant also asserts that plaintiff may not maintain this action since he has not exhausted his administrative *581 remedies. The exhaustion rule is based on the sound policy that the judicial branch should exercise due restraint in entering the administrative field where the subject has been committed by statute to the administrative expertise. Until the full course of administrative action is followed, the administering agency has not exercised its full expertise. Thus, where the action in question does not involve issues within the administrative expertise, the rule will not apply  as where the issues are controlled solely by questions of law, Nolan v. Fitzpatrick, 9 N.J. 477 (1952); Stalford v. Barkalow, 31 N.J. Super. 193 (App. Div. 1954); or where the jurisdiction of the administrative tribunal is doubtful, Ward v. Keenan, 3 N.J. 298 (1949); or where the administrative remedies are futile, illusory or vain, Kollarich v. Mayor and Council of Borough of Ramsey, supra; or where exhaustion of the administrative remedies is not required in the interests of justice, Gualano v. Board of Estimate of Elizabeth School Dist., 72 N.J. Super. 7 (App. Div. 1962).
In the instant matter the questions presented by plaintiff are solely questions of law. The action of the board on February 12, 1963 being a nullity, and the action of the board taken on November 20, 1962 being effective and controlling, plaintiff was not required to exhaust its administrative remedies by taking an appeal to the council before instituting this action.
Defendant argues that plaintiff was not the applicant for the proposed subdivision before the board, and consequently it was not aggrieved by the action of the board and is not a proper party plaintiff in these proceedings. The court finds this argument to be without merit.
The November 20, 1962 action of the board is accordingly found to be effective and controlling, and the council is directed to execute the necessary agreements in accordance with the November 20, 1962 decision of the planning board.
An order in conformity with these findings may be submitted.