NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3155-19

COLUMBIA FRUIT FARMS, INC.,
PLEASANTDALE FARMS, INC.,
GLOSSY FRUIT FARMS, INC.,
MILL ROCK FARMS, LLC, JOE
DONIO FARMS, ATLANTIC
BLUEBERRY, INC., WHALEN
FARMS, LLC, WINSLOW
JUNCTION PRODUCE, LLC,
STONEY CREEK BLUEBERRIES,
LLC, PASTORE ORCHARDS,
INC., BLUE BIRD FARM, LLC,
VARIETY FARMS, INC.,
CARMEN MERLINO T/A
OAKCREST FARMS, COUNTRY
BLUES, LLC., DACOSTA
BLUEBERRY FARMS, INC.,
RICHARDS AVENUE
HAMMONTON NJ LLC,
CONSALO FAMILY FARMS,
LLC, VACCARELLA FARMS
LLC, J. BERENATO FARMS,
LLC, CASSADAY FARMS, LLC,
BIG BUCK FARMS, LLC, BERRY
BROTHERS, CLARK FARMS,
LLC, SF SYSTEMS, LLC,
SHEPPARD FARMS, INC.,
KATONA FARMS, INC., SAND
FARMS, INC., MAUGERI
FARMS, LLC, STECHER FARMS,
LLC,

       Plaintiffs-Appellants,

> **APPROVED FOR PUBLICATION**
>
> **December 13, 2021**
>
> **APPELLATE DIVISION**

v.

DEPARTMENT OF COMMUNITY
AFFAIRS and LT. GOVERNOR
SHEILA Y. OLIVER, in her official
capacity as Commissioner of the
Department of Community Affairs,

    Defendants-Respondents.

_____

Argued December 2, 2021 – Decided December 13, 2021

Before Judges Alvarez, Haas, and Mawla.

On appeal from the New Jersey Department of Community Affairs.

Corinne McCann Trainor argued the cause for appellants (Fox Rothschild, LLP, attorneys; Michael J. Malinsky, Christopher C. Fallon, and Corinne McCann Trainor, of counsel and on the briefs; Allison L. Hollows, on the briefs).

Dominic L. Giova, Deputy Attorney General, argued the cause for respondents (Andrew J. Bruck, Acting Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Susan M. Scott, Deputy Attorney General, and Dominic L. Giova, on the brief).

The opinion of the court was delivered by

HAAS, J.A.D.

Appellants are a group of twenty-nine, unaffiliated New Jersey farms that plant, grow, and harvest a variety of crops each year. Appellants maintain

"commercial farm buildings"[1] on their respective properties. During the growing season, appellants employ and house a number of workers in these structures. Despite this obvious change of use from structures intended to store agricultural products and equipment to residences for human beings, appellants refused to implement the additional fire safety measures required for residences by the New Jersey Uniform Construction Code (UCC), N.J.S.A. 52:27D-119 to -141.

In May 2018, the Director of the Division of Codes and Standards (Director) in the Department of Community Affairs (DCA) sent a letter to local construction officials reminding them of their responsibility to issue notices of violation when a farm failed to add fire suppression systems to the buildings in which their workers lived as required by the UCC. In March 2019, the Director sent a similar letter to the construction officials and again stated that the UCC regulations should be enforced. As a result, the officials cited eighteen of the twenty-nine appellants for violating DCA's fire safety regulations between 2018 and 2019. None of these farms challenged the notices of violation.

---

[1] A "commercial farm building" is defined as "any building located on a commercial farm which produces not less than $2,500 worth of agricultural or horticultural products annually which building's main use or intended use is related to the production of agricultural or horticultural products produced on that farm." N.J.A.C. 5:23-3.2(d)(1).

On February 4, 2020, the Director sent a third letter to the construction officials again instructing them to enforce the change-of-use regulation when a farm converted a commercial farm building to residential living quarters for workers. The Director also set forth the steps the officials should require the affected farms to take in order to come into compliance with the UCC.

The Director forwarded a similar letter to the New Jersey Secretary of Agriculture (Secretary) outlining the UCC requirements for residential structures used to house farm workers, with particular emphasis on "the need for the installation of an automatic sprinkler system." In turn, the Secretary distributed that letter to an unknown number of farms. Appellants thereafter filed a notice of appeal alleging that the Director's February 4, 2020 inter-agency letter to the Secretary constituted a "new agency rule" that DCA did not adopt in accordance with the rulemaking procedures required by the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -31.

However, the Director's February 4, 2020 letter merely conveyed information to the Secretary about the local construction officials' responsibility to enforce the UCC's existing change-of-use regulation and recommended actions the officials should require non-compliant farms to take to avoid future violations. The letter also "lacked the basic earmarks of a rulemaking, an administrative quasi-legislative exercise[,] [and] it bore few of

the qualities that characterize a rulemaking activity subject to the procedural requirements of the APA." N.J. Educ. Ass'n v. Librera, 366 N.J. Super. 9, 16 (App. Div. 2004) (citing Metromedia, Inc. v. Dir., Div. of Tax'n, 97 N.J. 313, 331-32 (1984)). Because the letter was not a new agency rule, we dismiss appellants' appeal.

## I.

We begin by reviewing the statutes and regulations the Director relied on in instructing the local construction officials to ensure that farms complied with fire safety requirements if they housed workers in structures formerly used as barns and storage facilities. The Uniform Construction Code Act (the Act) "provides for promulgation by the DCA Commissioner of a uniform construction code to establish unitary up-to-date construction standards . . . ." DKM Residential Props. Corp. v. Twp. of Montgomery, 182 N.J. 296, 303 (2005) (citing N.J.S.A. 52:27D-122(b), -122.1(a), and -123.1). Pursuant to the Act, the DCA Commissioner adopted the UCC, which regulates all buildings and structures. N.J.A.C. 5:23-2.2(a).

The UCC classifies buildings into a number of "use groups" and applies different safety requirements upon these structures depending on the category in which they are classified. See N.J.A.C. 5:23-1.4 (defining a "use group" as "the classification of an occupancy" of any given structure). Commercial farm

buildings fall under the "S-2 use group" classification, which covers barns and storage facilities "used for the storage of agricultural or horticultural products, farm machinery and farm equipment, or farm materials . . . ." N.J.A.C. 5:23-3.2(d)(2).

Buildings used as residential structures do not fall under the S-2 use group and, instead, are included in "the R-2 use group." N.J.A.C. 5:23-3.2(d)(9)(i). A building is considered as having a residential use when it contains sleeping units or more than two dwelling units where occupants are primarily permanent. International Building Code (IBC) §310.3 (2018); N.J.A.C. 5:23-3.14(a) (adopting IBC for New Jersey). Residential structures are subject to heightened safety requirements and standards because they present higher safety risks compared to buildings in the S-2 use group. See N.J.A.C. 5:23-6.31(g) (Table G). Among other things, owners of buildings in this category must install automatic sprinkler systems, smoke alarms, and other safety equipment. See N.J.A.C. 5:23-6.26; N.J.A.C. 5:23-6.31(g).

II.

The issue presented in this case concerns appellants' decision each year to change the use of their commercial farm buildings, barns, and storage facilities to residential housing for farm workers. Under the UCC, it is "unlawful to change the use [group] of any structure or portion thereof without

the prior application for and issuance of a certificate of occupancy . . . ." N.J.A.C. 5:23-2.6(b). The certificate of occupancy is conditioned upon compliance with the UCC's rehabilitation subcode. N.J.A.C. 5:23-6.1 to -6.33; N.J.A.C. 5:23-2.6(b)(1).

When a building's use is changed, the owner must bring the building into compliance with N.J.A.C. 5:23-6.31(a)(1),[2] which establishes specific requirements for each potential use of a structure. For example, if a building's use is changed from commercial to residential, the additional safety requirements for this use group require that automatic sprinkler systems be installed pursuant to this change-of-use regulation. See N.J.A.C. 5:23-6.31(g)(1).

Local construction officials enforce the UCC in municipalities across the State, and DCA oversees that enforcement. N.J.S.A. 52:27D-124(k). See generally N.J.A.C. 5:23-4.3. These officials may issue a notice of violation if they find the owner's use of a building violates the UCC. The cited individual or entity may contest the violation by filing a written application with the Construction Board of Appeals (Board) within fifteen days of receiving the

---

[2] N.J.A.C. 5:23-6.31(a)(1), also known as the "change-of-use regulation," states in part that "[w]hen the use of a building is changed, then the building must be brought into compliance with the requirements of this section."

notice.  N.J.A.C 5:23A-2.1(a)(1).  Once the Board renders a decision, the party may seek further relief in the Law Division.  N.J.A.C. 5:23A-2.3(d).

DCA is authorized "[t]o monitor the compliance of local enforcing agencies . . . [and] to order corrective action as may be necessary where a local enforcing agency is found to be failing to carry out its responsibilities under th[e] [A]ct . . . ."  N.J.S.A. 52:27D-124(k).  We have previously observed "that the Legislature clearly intended that this statute be interpreted so as to enable the DCA to take effective action to assure proper enforcement of the [UCC], for which it is ultimately responsible, when a local enforcing agency does not carry out its responsibilities under the Act."  In re Dep't of Cmty. Affs. Order of Mar. 15, 1989 Regarding Burlington Cty. Recycling Facility, 232 N.J. Super. 136, 142 (App. Div. 1989).

Sometime prior to May 2018, the Director learned "that in many cases[,] farm buildings that were intended for other purposes, usually storage, [were] being used to house farm labor[ers]."  Because these structures were commercial farm buildings classified in the S-2 use group, the Director determined that the UCC's change-in-use regulation required the farm owners to upgrade the buildings' safety features before using them as residential units for their workers.

On May 11, 2018, the Director wrote a letter to local construction officials advising that "[a] notice of violation must be issued where there has been an illegal change of use group." The Director's letter suggested that the officials "obtain compliance in stages" and set forth the requirements the farms needed to meet in order to comply with the UCC. When some of the officials did not issue notices of violation, the Director sent a second letter on March 7, 2019, reminding them of the need to do so.

As a result of the letters, the officials cited eighteen of the twenty-nine appellants for violations of the UCC's change-of-use regulation because the farms had converted barns and other storage buildings to housing for farm workers. None of the cited appellants contested these notices and, therefore, the violations are deemed to be established.

On February 4, 2020, the Director sent a third letter to the construction officials and again stated that under the UCC, "[e]xisting pole barns, sheds, or similar structures that are being used as temporary farm labor housing must meet" the automatic sprinkler requirement. The Director explained:

> By way of background, it is necessary to understand the UCC requirements for an existing building being converted, or that has already been converted, to temporary farm labor housing. When a structure built for the storage of farm equipment and/or supplies is to be used as living quarters, it is considered a *change of use* per the UCC at N.J.A.C. 5:23-6.31. It is also a change of use when a single-family home is utilized to

house more than five roomers or lodgers who are unrelated. All such buildings are classified as Residential Group R-2 structures, and must meet all of the requirements of the UCC rehabilitation subcode, N.J.A.C. 5:23-6.1 [to -6.33.]

The Director instructed the officials to initiate steps to ensure compliance with the change-of-use provisions before the start of the 2020 growing season. He recommended the officials and the farm owners agree to a compliance schedule for the installation of the required safety equipment.

On February 4, 2020, the Director sent a virtually identical letter to the Secretary "outlin[ing] the [UCC] requirements" applicable to changes of use from farm product and equipment storage structures to farm worker housing units. The next day, the Secretary forwarded the Director's letter, together with a letter of his own, essentially repeating the information set forth in the Director's correspondence to a number of "growers."[3]

On April 10, 2020, appellants filed a notice of appeal to this court. They argue that the Director's February 4, 2020 letter to the Secretary "was improper rulemaking and invalid under the [APA]."

## III.

Before turning to the merits of appellants' claim, we first address DCA's argument that the appeal should be dismissed because appellants are actually

---

[3] The Secretary did not further identify the letter's recipients.

challenging the eighteen notices of violation the local construction officials issued to them in 2018 and 2019. DCA asserts appellants failed to exhaust their administrative remedies in connection with those notices and, therefore, their appeal should be dismissed. This argument lacks merit.

In general, "[e]xhaustion of administrative remedies before resort to the courts is a firmly embedded judicial principle." K. Hovnanian Cos. of N. Cent. Jersey, Inc. v. N.J. Dep't of Env't Prot., 379 N.J. Super. 1, 8 (App. Div. 2005) (quoting Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 558-59 (1979)). This rule is "designed to allow administrative bodies to perform their statutory functions in an orderly manner without preliminary interference from the courts." Brunetti v. Borough of New Milford, 68 N.J. 576, 588 (1975) (citing Ward v. Keenan, 3 N.J. 298, 302 (1949)). However, the Supreme Court has noted "that the preference for exhaustion of administrative remedies is one 'of convenience, not an indispensable pre-condition.'" Abbot v. Burke, 100 N.J. 269, 297 (1985) (quoting Swede v. City of Clifton, 22 N.J. 303, 315 (1956)).

Here, the eighteen cited appellants had an administrative remedy; they each could have filed a written application for a hearing before the Construction Board of Appeals (Board) within fifteen days of receiving the notice of violation. N.J.A.C 5:23A-2.1(a)(1). None of them took advantage of

this available remedy and the time to do so expired long ago. Thus, the change-of-use violation set forth in each of the notices has been established and appellants can no longer challenge them. As a result, these appellants have no administrative remedies left to exhaust.

The local construction officials did not issue notices of violation to the remaining appellants and, therefore, they also have no administrative remedies to exhaust. Accordingly, we reject DCA's contention on this point.

IV.

In their brief, appellants contend the Director's February 4, 2020 letter to the Secretary was invalid as a matter of law because this inter-agency correspondence constituted improper rulemaking in violation of the APA. We disagree.

Our review of an administrative agency's final determination is limited. In re Adoption of Amends. to N.E., Upper Raritan, Sussex Cnty. & Upper Del. Water Quality Mgmt. Plans, 435 N.J. Super. 571, 582 (App. Div. 2014) (citing In re Carter, 191 N.J. 474, 482 (2007)). We "afford[] a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014) (quoting City of Newark v. Nat. Res. Council, Dep't of Env't Prot., 82 N.J. 530, 539 (1980)). We interfere only if we "conclude that the decision of the

12

administrative agency is arbitrary, capricious[,] or unreasonable, or is not supported by substantial credible evidence in the record as a whole." J.D. v. N.J. Div. of Developmental Disabilities, 329 N.J. Super. 516, 521 (App. Div. 2000).

Our review is therefore limited to three questions: 1) whether the decision is consistent with the agency's governing law and policy; 2) whether the decision is supported by substantial evidence in the record; and 3) whether, in applying the law to the facts, the agency reached a decision that could be viewed as reasonable. In re Adoption of Amends., 435 N.J. Super. at 583 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)). Implicit in the scope of our review is a fourth question: whether the agency's decision offends the State or Federal Constitution. George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27 (1994). The burden of proof is on the party challenging the agency's action. Lavezzi, 219 N.J. at 171.

Additionally, an administrative agency is afforded considerable discretion in selecting the appropriate manner of fulfilling its statutory obligations, Nw. Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 137 (2001), but its "discretion to act formally or informally is not absolute." In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 133 (App. Div. 2013) (citing Airwork Serv. Div. v. Dir., Div. of Tax'n, 97 N.J. 290, 303-04 (1984)). "Agencies

should act through rulemaking procedures when the action is intended to have a 'widespread, continuing, and prospective effect,' deals with policy issues, materially changes existing laws, or when the action will benefit from rulemaking's flexible fact-finding procedures." In re Provision of Basic Generation Serv. for Period Beginning June 1, 2008, 205 N.J. 339, 349-50 (2011) (quoting Metromedia, 97 N.J. at 329). Formal rulemaking "allows the agency to further the policy goals of legislation by developing coherent and rational codes of conduct 'so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance.'" Gen. Assembly of N.J. v. Byrne, 90 N.J. 376, 385-86 (1982) (quoting Boller Beverages, Inc. v. Davis, 38 N.J. 138, 152 (1962)).

The APA "provides the necessary starting point for any analysis of an agency's chosen pathway for action." Provision of Basic Generation Serv., 205 N.J. at 347-48. The APA defines an "administrative rule" as an "agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." N.J.S.A. 52:14B-2. That definition does not include: "(1) statements concerning the internal management or discipline of any agency; (2) intra-agency and inter-agency statements; and (3) agency decisions and findings in contested cases." Ibid.

14

Where the agency action satisfies the definition, "its validity requires compliance with the specific procedures of the APA that control the promulgation of rules." Airwork Serv., 97 N.J. at 300 (citing Metromedia, 97 N.J. at 334); see also N.J.S.A. 52:14B-4(d) (stating a rule must be adopted in "substantial compliance" with APA). These procedures require the agency to, among other things, publish notice of the proposed rule and inform "interested persons" and "all persons who have made timely requests of the agency for advance notice of its rule-making proceedings[,]" N.J.S.A. 52:14B-4(a)(1), "[a]fford all interested persons a reasonable opportunity to submit data, views, comments, or arguments, orally or in writing[,]" N.J.S.A. 52:14B-4(a)(3), and "[p]repare for public distribution . . . a report . . . providing the agency's response to the data, views, comments, and arguments contained in the submissions." N.J.S.A. 52:14B-4(a)(4).

Whether an agency must undertake formal rulemaking for a contemplated action depends on the extent to which the action:

> (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that

15

(i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[Metromedia, 97 N.J. at 331-32.]

A court's determination whether rulemaking is required under that standard entails a qualitative evaluation, rather than a quantitative one. State v. Garthe, 145 N.J. 1, 7 (1996). Not all criteria need be satisfied. In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 518 (1987). These factors, "either singly or in combination," determine whether the agency's action amounts to the promulgation of an administrative rule, so long as they preponderate in favor of the formal rulemaking process. Metromedia, 97 N.J. at 331-32.

Applying the Metromedia factors, we are satisfied the Director's February 4, 2020 letter outlining the UCC's existing change-of-use regulation and recommending the corrective actions the construction officials needed to require the farms to take was not an administrative rule. Beginning with the first factor, this correspondence was not intended to have wide coverage encompassing a large segment of the regulated public. The Director sent the letter to apprise the Secretary of the request he made to the construction

16

officials to enforce existing UCC requirements. Because the letter merely reiterated existing law, it had no impact on the farms. See Librera, 366 N.J. Super. at 15 (explaining that an agency memorandum outlining a new requirement implemented by the Legislature did not actually create the impact the requirement had on the school system).

The second Metromedia factor is met because the permissible enforcement actions outlined in the letter were intended to apply to all similarly situated farms. However, the third factor was not met because these enforcement actions were not intended to apply only in future cases. Indeed, the Director previously sent similar letters to the construction officials in 2018 and 2019, and these officials had already issued a number of notices of violation based on the existing UCC requirements.

As noted above, the change-of-use regulation was already a part of the UCC and, therefore, the Director's letter did not "prescribe[] a legal standard or directive that [was] not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization . . . ." Metromedia, 97 N.J. at 331. The letter did not prescribe the standards the farms had to implement in order to house their workers because these requirements were already codified in N.J.A.C. 5:23-6.31(g). Therefore, the fourth Metromedia factor is not present.

The fifth factor is also not met. The details contained in the February 4, 2020 letter were previously set forth in the similar letters the Director sent to the local construction officials in 2018 and 2019. Those officials acted on the information in these letters by citing farms for violating the change-of-use regulation by converting their storage barns and sheds into housing for farm workers. Thus, the February 4 correspondence did not "constitute[] a material and significant change from a clear, past agency position on the identical subject matter . . . ." Metromedia, 97 N.J. at 331.

Finally, the Director's letter to the Secretary does not satisfy the sixth Metromedia factor because the letter does not "reflect[] a decision on administrative regulatory policy in the nature of the interpretation of law or general policy." Id. at 331-32. The Director merely pointed to the existing UCC provisions that required farms wishing to house workers to upgrade their buildings to satisfy the UCC's fire safety and other requirements before implementing the new residential use.

The APA specifically states that the term "[a]dministrative rule . . . does not include . . . intra-agency and inter-agency statements . . . ." N.J.S.A. 52:14B-2. The Director's letter to the Secretary and his other letters to the local construction facilities were all intra-agency or inter-agency statements of existing law. The Metromedia factors also do not weigh in the favor of a

18

formal rulemaking requirement. Therefore, DCA did not have to comply with the APA's notice and comment procedures before the Director provided guidance to the local construction officials. We therefore dismiss appellants' appeal.

Dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3155-19